### In re FIDELITY BOND AND MORTGAGE COMPANY, Debtor.

### Fidelity Bond and Mortgage Company, Plaintiff,

v.

### Steven D. Brand, et al., Defendants.

Bankruptcy No. 99–18427.
Adversary No. 00–257.

United States Bankruptcy Court, E.D. Pennsylvania.

April 14, 2006.

William T. Hangley, Esquire, James M. Matour, Esquire, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA, for debtor.

## OPINION [1]

KEVIN J. CAREY, Bankruptcy Judge.[2]

Before the Court is a complaint (the "Complaint") filed by the plaintiff/debtor,

---

**1.** This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr.P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, § 157(a). The core/non-core status of the claims are discussed *infra*.

**2.** On December 9, 2005, I assumed office as a bankruptcy judge in the District of Delaware.

Fidelity Bond and Mortgage Company (the "Debtor"), on March 27, 2000 against defendants Steven D. Brand, James M. Dougherty, Arthur L. Powell, Trustee under Indenture of Trust of Lea R. Powell dated July 19, 1993, Richard S. Powell, Jon R. Powell, Carol P. Heller, Nancy E. Powell, Harold G. Schaeffer, Trustee under Indenture of Trust of Adele K. Schaeffer dated July 19, 1993, James R. Schaeffer, Anthony L. Schaeffer, and Robert D. Schaeffer (the "Defendants"). The Defendants filed an answer to the Complaint on May 24, 2000 (docket no. 31).

The Debtor's focus in this litigation is two-fold.[3] First, it seeks to avoid and recover a cash distribution in the amount of $1,705,000 made on April 30, 1998 from the Debtor to the Defendants in their capacity as shareholders of the Debtor (the "Distribution"). The Distribution was made immediately prior to a merger (the "Merger") between the Debtor and another mortgage banking company known as Phoenix Mortgage Company ("Phoenix"). The Debtor argues that the Distribution may be avoided and recovered on two theories: (I) the Distribution was a fraudulent transfer under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. § 5101 *et seq.* ("PUFTA"), and (ii) the

Distribution violated the Pennsylvania Business Corporation Law of 1988, 15 Pa. C.S.A. § 1551.

Second, the Debtor seeks to avoid liability on certain promissory notes (the "Promissory Notes") in the aggregate original principal amount of $1,200,000, which were given to the Defendants in connection with the Merger. The Debtor argues that the Promissory Notes were also fraudulent transfers under PUFTA. In the alternative, the Debtor seeks to recharacterize the Promissory Notes as equity or to equitably subordinate any obligation it may have to the Defendants based upon the Promissory Notes.

■ The parties filed a Joint Pretrial Statement on April 2, 2001 (docket no. 54). In the Joint Pretrial Statement, the parties agreed that Counts I, IV & V are core proceedings under 28 U.S.C. § 157(b)(1) and (2)(B), (E), (H), (K) and (O). The parties also agreed that Count II is a non-core proceeding related to a case under title 11 of the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*)(the "Bankruptcy Code"), but consented to entry of a final order by this Court with respect to Count II. Whether certain issues are core or non-core is a legal question and the

On the same date, I was designated by the Third Circuit Court of Appeals to sit as a bankruptcy judge in the Eastern District of Pennsylvania for the purpose of completing various matters, including this one.

3. The Debtor's Complaint contains five counts, as follows:
 (i) Count I seeks to avoid and recover the Distribution in the amount of $1,705,000 pursuant to the Bankruptcy Code (11 U.S.C. § 544 and § 550), and the Pennsylvania Uniform Fraudulent Transfer Act (12 Pa.C.S.A. § 5101 *et seq.*)("PUFTA");
 (ii) Count II seeks recovery of the Distribution under the Pennsylvania Business Corporation Law of 1988 (15 Pa.C.S.A. § 1551(b) and § 1553(a));

 (iii) Count III objects to the proofs of claim for amounts due under the Promissory Notes filed by the Defendants in the Debtor's bankruptcy case;
 (iv) Count IV seeks to avoid any obligation for amounts due to the Defendants under the Promissory Notes pursuant to Bankruptcy Code § 544 and PUFTA;
 (v) Count V seeks, in the alternative, to recharacterize or equitably subordinate any obligations to the Defendants under the Promissory Notes pursuant to Bankruptcy Code § 510.
Prior to filing the Joint Pretrial Statement, the Debtor decided not to pursue Count III.

Court is not bound by the parties' stipulations regarding questions of law. *Mintze v. American General Financial Services, Inc. (In re Mintze)*, 434 F.3d 222, 228 (3d Cir.2006). I agree with the parties that Counts I, IV & V are core proceedings under 28 U.S.C. § 157(b)(1) and (2)(H), (K), and (O).

On April 5, 2001, trial of this matter began and spanned over thirty-three days throughout 2001 and 2002, with numerous exhibits offered into evidence. At the close of the trial, the parties submitted a post-trial briefing schedule, which was amended. The Debtor filed its Amended Proposed Findings of Fact and Conclusions of Law on March 12, 2003 (docket no. 173). The Defendants filed their Proposed Findings of Fact and Conclusions of Law on July 14, 2003 (docket no. 179). The parties then filed their respective post-trial briefs on November 6, 2003 (docket no. 187; docket no. 189).

After a conference call with the Court on December 22, 2004, the Defendants filed a motion to reopen the record on February 4, 2005 (docket no. 194). The Debtor filed a response on March 23, 2005 (docket no. 198). Oral argument regarding the motion to reopen the record was held on May 18, 2005. At oral argument, the Court reopened the record to include the parties' arguments regarding the effect of a district court decision in related litigation, *Powell v. First Republic Bank*, 274 F.Supp.2d 660 (E.D.Pa.2003), *aff'd* 113 Fed.Appx. 470 (3d Cir.2004), on this adversary proceeding.

For the reasons set forth below, I conclude that judgment should be entered against the Plaintiff and in favor of the Defendants on Count I (fraudulent transfer of the Distribution), Count II (violation of the Pennsylvania Business Corporation Law), and Count IV (fraudulent transfer of the Promissory Notes). I further conclude that judgment should be entered in favor of the Plaintiff and against the Defendants on Count V (recharacterization of the Promissory Notes).

### FINDINGS OF FACT

At all times relevant prior to the Merger, Old Fidelity was engaged in the origination, purchase, sale and servicing of residential mortgage loans collateralized by real estate.[4] (Joint Pretrial Statement, Statement of Uncontested Facts, ¶ 14.)[5] Loan servicing, as opposed to loan origination, was the primary focus of Old Fidelity's business. (*Id.*) All of Old Fidelity's issued and outstanding stock was owned by the Defendants. (JPS, ¶ 2.)

Prior to the Merger, Phoenix also was engaged in the origination, purchase, sale and servicing of various types of loans. (JPS, ¶ 15.) However, loan origination, as opposed to loan servicing, was the primary focus of Phoenix's business. (*Id.*)

In 1997, Old Fidelity and Phoenix had discussions about combining their operations to create a mortgage banking entity that would engage in the business of originating, selling and servicing residential mortgage loans. (Salmon, April 5, 2001, Tr. at 81.) On January 7, 1998, First Republic Bank, Phoenix, Old Fidelity and the Defendants executed a Letter of Intent (the "LOI") concerning, *inter alia*, the sale of 80 percent of the stock of Fidelity. (JPS, ¶ 3; Ex. P–1.) The LOI, along with its schedules and exhibits, were incorporated into an agreement (the "Definitive

---

4. Fidelity Bond and Mortgage, as it existed prior to the Merger, will be referred to herein as "Old Fidelity."

5. Hereinafter, the uncontested facts in the Joint Pretrial Statement will be referred to as ("JPS, ¶ ___").

Agreement") signed by First Republic Bank, the shareholders of Phoenix, Old Fidelity and the Defendants (jointly, the "Parties to the Merger") on May 1, 1998, but effective as of April 30, 1998. (JPS, ¶ 4; Ex. P–3.)

Pursuant to the terms and conditions of the Definitive Agreement and the LOI, the parties engaged in a multi-step transaction in which, *inter alia,* a new company, FBMC Acquisition Company ("FBMC") was formed by First Republic Bank and Phoenix. (*Id.*) Specifically, the Parties to the Merger structured the Merger as follows:

- First Republic Bank and the Phoenix shareholders formed FBMC. First Republic Bank contributed $1,645,000 cash to FBMC, the Phoenix shareholders contributed 100% of the stock of Phoenix; and Phoenix shareholder Ronald H. White contributed $70,000 in cash. Phoenix became a wholly-owned subsidiary of FBMC.

- FBMC used the cash it received, totaling $1,715,000, to purchase 80% of Old Fidelity's outstanding common stock from the Defendants.

- FBMC gave the Defendants 20% of the issued and outstanding common stock of FBMC in exchange for the remaining 20% of Old Fidelity stock held by the Defendants. The Defendants also received $1,200,000 in Promissory Notes from FBMC.[6] Old

Fidelity became a wholly-owned subsidiary of FBMC.

- Phoenix merged into Fidelity. The post-merger entity of Fidelity Bond and Mortgage Company included the operations of both Old Fidelity and Phoenix ("New Fidelity").[7]

- At the conclusion of the transaction, FBMC's stock was distributed as follows:

 - 47% was issued to First Republic Bank;

 - 31% was issued to the former shareholders of Phoenix;

 - 20% was issued to the Defendants; and

 - 2% was issued to Ronald H. White.[8]

(Ex. P–3, Revised Schedule 2; Ex. P–146; Ex. P–147; Salmon, April 5, 2001, Tr. at 105–07; Salmon, April 6, 2001, Tr. at 123–25; Brand, April 30, 2001, Tr. at 11–17.)

(a) *Pre–Merger Events.*

(1) *The Summit Bank Loans.*

Under the terms of the LOI and Definitive Agreement, the parties required that, as a condition precedent to the Merger, Old Fidelity obtain a term loan from Summit Bank in an amount not less than $7,000,000, secured by Fidelity's servicing rights and other assets (the "Summit Term Loan"). The proceeds of the Summit Term Loan would be used, in part, to pay off an existing term loan and line of credit.[9] (JPS, ¶ 5; Ex. P–1 at 2, 10.) The LOI

---

**6.** On May 1, 1998, New Fidelity became a co-obligor on the Promissory Notes. (JPS, ¶ 13.)

**7.** New Fidelity is the same entity that is referred to herein as the "Debtor."

**8.** After the Merger, the Parties to the Merger intended to merge FBMC out of existence, but that never happened. (Salmon, April 6, 2001, Tr. at 125, 128.)

**9.** When the Defendants originally acquired Old Fidelity in 1993, they obtained a $6.5 million dollar term loan and $1 million dollar line of credit from United Jersey Bank, which subsequently became part of Summit Bank. (Brand, April 20, 2001, Tr. at 71; Ex. P–70A at 4.) The proceeds of the Summit Term Loan paid the amount then due on the 1993 term loan of $4,401,817.55, and the amount then due on 1993 line of credit of $503,423.61. (Ex. P–49.)

further stated that "[t]he consummation of the transaction contemplated by this LOI shall be subject to and conditioned upon, among other things . . . a $500,000 working capital line of credit on terms and conditions acceptable to each of the Purchasers." (JPS, ¶ 5, Ex. P–1 at 10.)

On April 28, 1998, Old Fidelity and Summit Bank entered into a Revolving Credit and Term Loan Agreement (the "Summit Loan Agreement") under which Summit Bank provided Fidelity with the Summit Term Loan of $7,000,000 and agreed to extend a working capital line of credit of up to $500,000. (Ex. P–2; JPS, ¶ 6.) The term loan and line of credit were secured by Fidelity's mortgage servicing rights and certain other assets. (Id.; Ex. P–2 at 19–21.) All of the Parties to the Merger reviewed documents, participated in the negotiation of terms, and consented to Old Fidelity's execution of the Summit Loan Agreement. (Salmon, April 6, 2001, Tr. at 140–43; Ex. D–21; Ex. D–22.) [10]

The Summit Loan Agreement provided that if at any time before December 31, 1998 the outstanding principal balance of the $7,000,000 Summit Term Loan exceeded 85% of the "Portfolio Valuation," Fidelity was required immediately to prepay the $7,000,000 loan in an amount sufficient to bring the outstanding principal into compliance with the 85% ratio (the "Prepayment Provision").[11] (JPS, ¶ 7, Ex. P–2, ¶ 2(e) at 16.) For calendar year 1999, the

Summit Loan Agreement set the ratio at 80%. (Id.)

Furthermore, the "Affirmative Covenants of the Borrower" in the Summit Loan Agreement provided that the borrower would not permit Summit Bank's total exposure, including the sum of the Commitment (defined as the $500,000 revolving line of credit and the $7 million term loan), to be greater than 85% of the Portfolio Valuation (the "Paragraph 6(p)(4) Loan–to–Value Covenant"). (Ex. P–2, ¶ 6(p)(4) at 38.) Therefore, the borrower needed a Portfolio Valuation of $8,823,529 to comply with the Paragraph 6(p)(4) Loan–to–Value Covenant if the outstanding loan was in the full amount of $7,500,000. (Brand, April 20, 2001, Tr. at 116–17; Marquez, May 7, 2001, Tr. at 42–44.)

In the course of its business dealings with Old Fidelity, Summit Bank determined the Portfolio Valuation as follows:

(1) Old Fidelity would hire a third-party analyst to prepare a portfolio evaluation, typically using year-end numbers (the "Third–Party Portfolio Evaluation");

(2) Summit Bank would provide the Third–Party Portfolio Evaluation to its own outside experts, Smith Breslin, who would review the reasonableness of the assumptions underlying the Third–Party Portfolio

---

**10.** Although there was some question about whether Brand, on behalf of Old Fidelity, directed the Summit Loan Agreement negotiations, Summit Bank's representative, Adrian M. Marquez, testified that his principal contact for negotiations was Brand. (Brand, April 20, 2001, Tr. at 79–81; Marquez, May 7, 2001, Tr. at 15–17.) Brand signed the Summit Loan Agreement on April 28, 1998 on behalf of Old Fidelity. (Brand, April 20, 2001, Tr. at 74; Ex. P–2.)

**11.** Under the Summit Loan Agreement, the Portfolio Valuation was defined as the "value of the Portfolio to Borrower determined by Bank based upon an assessment by an appraiser experienced in such valuations, selected and paid for by the Borrower, subject to Bank's approval as to the identity of the appraiser and the extent, format and application of the valuation report." (Ex. P–2 at 10.) "Portfolio" was defined as "at any time, the aggregate of Borrower's Residential Mortgage Loans which are the subject of its Servicing Agreements." (Ex. P–2 at 10; JPS, ¶ 8.)

Evaluation and would provide its own range of multipliers to Summit Bank for determining the market value of Old Fidelity's loan-servicing portfolio;

(3) Summit Bank would select a multiplier from the range provided by Smith Breslin, and then would multiply the unpaid principal balance of the loans in the loan-servicing portfolio by the selected multiplier to determine Portfolio Value for purposes of determining compliance with the loan covenants.

(Marquez, May 7, 2001, Tr. at 10–13; 23; Ex. P–70A at 6.) In preparing for the Merger, the Prestwick Mortgage Group ("Prestwick") performed an evaluation of the "market value" of Old Fidelity's loan servicing portfolio as of January 26, 1998. (JPS, ¶ 9; Ex. P–1, at 3; Ex. P–46.) Using information supplied by Old Fidelity, Prestwick estimated that the range of "market value" for the loan servicing portfolio being serviced as of December 31, 1997, fell between 1.2727% and 1.5005%, multiplied by the total unpaid principal balance of the loans in the loan servicing portfolio (the "Portfolio's Unpaid Principal Balance"). (*Id.*). The Portfolio's Unpaid Principal Balance as of December 31, 1997 was approximately $594 million. (Ex. P–46).

Consistent with the parties' previous dealings, Summit Bank sent the Prestwick report to Smith Breslin for review, and Smith Breslin determined the multiplier to be a range of 1.33 and 1.55 times the Portfolio's Unpaid Principal Balance. (Marquez, May 7, 2001, Tr. at 25–26). Summit Bank initially planned to use a multiplier of 1.33, but after discussions with Brand, it ultimately approved the use of 1.44 as the multiplier for purposes of determining compliance with the loan cove-

nants. (Marquez, May 7, 2001, Tr. at 26–29; 70–71.)

The Summit Loan Agreement was signed prior to closing of the Merger. (Ex. P–2). On or about April 30, 1998, Summit Bank funded the $7,000,000 term loan. (JPS, ¶ 11.) Summit Bank debited Fidelity's account to repay Fidelity's previous term loan and line of credit from the Summit Bank Loan. (JPS, ¶ 11).

### (2) *Federal Reserve Application.*

To participate in the Merger, First Republic Bank had to obtain approval from the Federal Reserve Bank of Philadelphia (the "Federal Reserve"). (Rapp, April 12, 2001, Tr. at 75–76). By a letter application dated April 8, 1998, First Republic Bank asked the Federal Reserve to approve its investment "in shares of common stock of Fidelity Bond and Mortgage." (Ex. P–15, at 1). In support of its application, First Republic Bank submitted, among other things, a Valuation Analysis of Old Fidelity as of March 31, 1998, Old Fidelity's audited financial statements for years ending 1995 and 1996, Phoenix's audited financial statements for year ending 1996, and projected income statement and balance sheet for Fidelity (1998–2002). (Ex. P–15, Attachments A, F, G, and H.) The Merger was approved by the Federal Reserve. (Salmon, April 6, 2001, Tr. at 132.)

### (3) *The Projections.*

The Parties to the Merger prepared annualized projections for the first five years of New Fidelity's operation (the "Projections"). (Ex. D–6.) The Projections were prepared by representatives of both Old Fidelity and Phoenix, who met and reviewed in detail the assumptions underlying the Projections. (Salmon, April 6, 2001, Tr. at 92–93; Heise, June 6, 2001, Tr. at 16–17; Brand, June 19, 2002, Tr. at 93–97.) The Projections were refined and

reworked numerous times. (Heise, June 6, 2001, Tr. at 159; Brand, June 19, 2002, Tr. at 96–97.) First Republic Bank also inspected drafts of the Projections, reviewed the assumptions underlying the Projections, and made suggestions and recommendations with respect to the Projections. (Rapp, April 12, 2001, Tr. at 156–57.)

(4) *The Distribution to the Defendants.*

Under the terms of the LOI, "[i]mmediately prior to the Closing of the Purchase Agreement, [Old Fidelity] may distribute to the selling shareholders all but $500,000.00 in cash. [Old Fidelity and Phoenix] shall provide, in addition to the $500,000.00, sufficient cash to make the next succeeding commission payroll for their respective employees." (Ex. D–1, at 4; JPS, ¶ 12.) On April 30, 1998, Old Fidelity transferred the amount of $1,705,000 (the "Distribution") by wire transfer to a bank account maintained by the Defendants' attorneys on the Defendants' behalf. (Brand, April 30, 2001, Tr. at 8–10; Ex. D–38; JPS, ¶ 12.)[12] On May 1, 1998, the Distribution was divided among and transferred to the Defendants. (*Id.*)

(b) *Post–Merger Events.*

(1) *Post–Merger Management of Fidelity.*

After closing of the Merger, 100% of the stock of New Fidelity was owned by

FBMC. (Salmon, April 6, 2001, Tr. at 123; Rapp, April 12, 2001, Tr. at 70–71.) Beginning April 30, 1998 and thereafter, Donald L. Salmon ("Salmon") became the president, chief executive officer, and chairman of the Board of Directors of New Fidelity. (Ex. D–35; Salmon, April 6, 2001, Tr. at 183.) The chief financial officer of New Fidelity was Christopher Heise. (Ex. D–35). On April 30, 1998, by unanimous consent of FBMC, it was resolved that the Board of Directors of New Fidelity would consist of Steven D. Brand, Donald L. Salmon, Ronald H. White, Harry D. Madonna, and George S. Rapp. (Ex. D–29).[13]

(2) *Cash available to New Fidelity Post–Merger.*

A condition to the Merger closing required that New Fidelity would have $500,000 in cash and $500,000 available through the working capital line of credit to operate. (Ex. P–1, at 10.) On the day of the Merger, New Fidelity had approximately $611,918 in cash. (Ex. P–88.) Just after the Merger, New Fidelity paid the following from the available cash: (I) $70,000 for the origination fee charged by Summit Bank for the loan, (ii) $130,000 for Phoenix's pre-Merger payroll; and (iii) $100,000 to bring the Phoenix escrows into compliance with federal guidelines. (Heise, June 6, 2001, Tr. at 165–67; Heise, June 25, 2001, Tr. at 113–15; Ex. P–44.)[14] Accordingly, New Fidelity's cash was de-

---

**12.** The purchase price paid by FBMC to the Defendants in return for 80% of the stock of Old Fidelity was transferred into the bank account maintained by the Defendants' attorneys on May 1, 1998. (Ex. D–38).

**13.** Prior to the Merger, Salmon and Heise were the Phoenix management. (Rapp, April 12, 2001, Tr. at 108.) Steven L. Brand ("Brand"), president of Old Fidelity, was the only member of New Fidelity's Board of Di-

rectors to represent the interests of the Defendants. (Rapp, April 12, 2001, Tr. at 108.)

**14.** Heise testified that, although the LOI required the parties to provide sufficient funds to cover pre-Merger payroll, Brand and Salmon agreed that Phoenix's pre-Merger payroll would be paid from loans that would be funded in May 1998. (Heise, June 6, 2001, Tr. at 164–65.)

creased shortly after the Merger to $311,918.

Just after the Merger, New Fidelity did not have access to the $500,000 line of credit from Summit Bank because New Fidelity was not in compliance with the covenants in the Summit Loan Agreement. (Salmon, April 6, 2001, Tr. at 152–53; Marquez, May 7, 2001, Tr. at 41; Rapp, April 12, 2001, Tr. at 14; Heise, June 6, 2001, at 51; Ex. P–44.) On September 28, 1998, however, the Summit Loan Agreement was amended to remove the $500,000 line of credit from calculation of the Paragraph 6(p)(4) Loan–to–Value Covenant. (Ex. P–143; Salmon, April 6, 2001, Tr. at 210–211; Marquez, May 7, 2001, Tr. at 44–45.) Shortly thereafter, New Fidelity drew down the entire $500,000 line of credit, so that the cash would be available if New Fidelity again found itself in violation of the Summit Loan Agreement covenants. (Salmon, April 9, 2001, Tr. at 109–110; Heise, June 28, 2001, Tr. at 165–66.)

The agreement between Summit Bank and New Fidelity amending the Summit Loan Agreement provided, in part, that upon release of the $500,000 line of credit funds, New Fidelity would use $83,000 to pay down the term loan so that the term loan would be in compliance with the amended Paragraph 6(p)(4) Loan–to–Value Covenant. (Ex. P–27; Salmon, April 6, 2001, Tr. at 212; Salmon, April 9, 2001, Tr. at 108–09; Heise, June 28, 2001, Tr. at 162.) Summit Bank also required that certain debt, including debt owed to Salmon and the Promissory Notes owed the Defendants be subordinated to Summit Bank's debt. (Ex. P–27.)

### (3) *Post–Merger Audit/Net Value.*

The LOI stated that the purchase price for the shares of Old Fidelity was based upon Old Fidelity's estimated net value of $4,000,000 as of September 30, 1997, which value would be adjusted at year end, but would not be "less than $2,500,000 nor more than $4,500,000." (Ex. P–1, at 2). On the closing date of the Merger, the Parties to the Merger agreed to assume that Fidelity had a net worth of $3,500,000. (Salmon, April 5, 2001, Tr. at 111–13; Heise, June 28, 2001, Tr. at 87.) The Parties to the Merger further agreed, however, that a post-Merger audit would be performed as of the date of the Merger to determine the actual net worth of Old Fidelity and adjustments would be made to ensure that the Parties to the Merger had each paid the proper amount for their respective shares of FBMC. (P–1 at 2, 4; Salmon, April 5, 2001, Tr. at 111–12.) After the Merger, the accounting firm of Rudolph, Palitz & Co. was hired to perform an audit. (Salmon, April 5, 2001, Tr. at 114.) A final audit report was never issued, but a draft audit report dated October 14, 1998, determined Fidelity's net value as of the Merger date to be $3,084,370. (Ex. P–56; Salmon, April 5, 2001, Tr. at 114–15.)

### (4) *Post–Merger Expansion of Origination Business.*

The pre-Merger application to the Federal Reserve stated, in part, that:

The parties expect additional expansion of the retail network into selected markets to occur beginning in the latter part of 1998 and continuing into 1999. Fidelity expects to open at least one new retail branch each year during 1998 and 1999. Fidelity intends to increase its business both geographically and in absolute terms by capitalizing upon the network of personal contacts of its experienced, top producing managers and loan officers, including principals of Phoenix. Through its distribution channels, Fidelity will offer a full line of home finance products directly to con-

sumers. Fidelity's product offerings will include conventional, government, non-conforming (for special credit, income and property circumstances), second, adjustable rate and home equity mortgage loans. Also, Fidelity intends to participate in state, local and community home buyer programs.

(Ex. P–15, p.4.) The Parties to the Merger projected a substantial increase in originations to occur as a result of the increase in mortgage refinancing and through expansion of origination programs. (Ex. P–70A, at p. 6.) In particular, Salmon testified that the Projections were based upon new lines of business that were "showing great promise," such as the Affinity Group[15] (i.e., a program that solicited borrowers through their employers), a sub-prime lending group, a government loan production group, and the NTO Group (i.e., a telephone solicitation group). (Salmon, April 9, 2001, Tr. at 77–79.)

One expansion, undertaken shortly after closing of the Merger, involved expansion of the government loan program into San Diego, California, by hiring a group of employees from another mortgage origination company, leasing office space, and leasing an apartment utilized by two employees.[16] (Salmon, April 6, 2001, Tr. at 198–204; Rapp, April 12, 2001, Tr. at 114–16.) The expansion in California was done without prior Board approval; the Board was advised of the expansion after it was completed. (Rapp, April 12, 2001, Tr. at 115–16.) Upon learning of the California expansion, the Board questioned the prudence of decision due to the high expense it generated at a time when New Fidelity was concerned about its tight cash position. (*Id.*)

Another expansion involved acquisition of a sub-prime lender, Eagle Financial Services ("Eagle"), which was approved by the Board of Directors at their meeting on June 10, 1998. (Ex. P–50 at M–4.) Although the acquisition of Eagle helped New Fidelity meet its projection of increasing originations of sub-prime mortgages during its first year of operations, the Eagle operations lost money every month after the acquisition was completed in September 1998. (Heise, June 25, 2001, Tr. at 165–67.)

During the first year of operations, New Fidelity met its projected goal for mortgage originations—at times exceeding the monthly goal of $30,000,000 originations per month. (Ex. P–84 at M000028; Salmon, April 6, 2001, Tr. at 173–76.) However, the increase in originations placed a strain on the revolving lines of credit, known as "warehouse" lines, used to fund the new loans, causing New Fidelity to "juggle" or to postpone closings at times during the summer of 1998 to ensure that sufficient funds were available to fund the closings.[17] (Fugok, December 18, 2001,

**15.** Although this program is referred to in the transcript as "Infinity Group," in the parties' post-trial submissions, this group is referred to as the Affinity Group.

**16.** The government loan program was "a program that would allow borrowers to obtain Federal Housing Administrative and Veterans Benefit Administrative loans on a 'no cost' basis in a streamlined manner." (Ex. D–81, at 10.)

**17.** A "warehouse" line of credit is available specifically for the purpose of funding loans to consumers while the loans are in process of being sold to end investors. (Salmon, April 9, 2001, Tr. at 116–17.) New Fidelity had two warehouse lines of credit just after the Merger of approximately $15 million each: one with PNC Bank (Old Fidelity's warehouse lender) and one with CoreStates Bank (Phoenix's warehouse lender). (Salmon, April 9, 2001, Tr. at 115; Fugok, December 18, 2001, Tr. at 226–27; Ex. P–70A at 7.) In July 1998, CoreStates Bank withdrew its warehouse line of credit. (Ex. P–54 at M–002876; Fugok, December 18, 2001 at 227). New Fidelity suc-

Tr. at 156–59). The increase in originations also caused increased costs, such as an increase in commissions and salaries for loan officers (Brand, June 20, 2002, Tr. at 19.)

### (5) *Post–Merger Runoff of Portfolio Value*

The unpaid principal balance of the loans in Old Fidelity's mortgage loan servicing portfolio as of December 31, 1997 was $594 million dollars. (Ex. P–46.) The Parties to the Merger prepared the Projections by estimating that the Portfolio's Unpaid Principal Balance as of the date of the Merger would be $577 million dollars, and would decrease at the rate of 12.5% per annum. (Ex. D–6.) However, the actual amount of the Portfolio's Unpaid Principal Balance as of April 30, 1998 was determined to be $549,774,000.[18] (Ex. P–51; Heise, June 6, 2001, Tr. at 31–34.)

After adding in the value of the Phoenix loan servicing portfolio, a memo prepared around August 1998 showed the combined Portfolio's Unpaid Principal Balance after the Merger to be decreasing as follows:

| | |
|---|---|
| 05/01/98 | $574,771,986 |
| 06/01/98 | $556,972,696 |
| 07/01/98 | $548,732,932 |

(Ex. P–44, at M000536). Salmon testified that the Portfolio's Unpaid Principal Balance decreased at a rate of approximately 20–25% during the first year, rather than the projected 12.5%. (Salmon, April 9, 2001, Tr. at 86.) The amount of $1,074,000 of New Fidelity's losses between May 1, 1998 and December 31, 1998 was attributed to the "excess run-off" of the Portfolio; that is, the decrease in the Portfolio's

Unpaid Principal Balance that was over and above the projected 12.5% run-off. (Ex. P–214, at M002699; Heise, June 25, 2001, Tr. at 159–60.) One year after the closing of the Merger, the Portfolio's Unpaid Principal Balance was roughly $363 million. (Salmon, April 9, 2001, Tr. at 86–87.)

### (6) *Post–Merger Summit Bank Events.*

While preparing the quarterly figures for Summit Bank for the period ending June 30, 1998, Heise and Salmon learned that Summit Bank was using the 1.44% multiplier to determine whether New Fidelity was in compliance with the Loan–to–Value Covenant. (Heise, June 6, 2001, Tr. at 39; Marquez, May 7, 2001, Tr. at 37.) By letter dated August 7, 1998, New Fidelity certified to Summit Bank that as of June 30, 1998 New Fidelity was compliant with the Paragraph 6(p)(4) Loan–to–Value Covenant if a 1.505% multiplier were used for valuing the loan servicing portfolio, instead of a 1.44% multiplier. (Ex. D–42; Heise, June 6, 2001, Tr. at 40–41.)

New Fidelity's management calculated that as of July 31, 1998, it was obligated to pay Summit Bank $283,509 to maintain compliance with the Paragraph 2(e) Loan–to–Value Obligation. (Ex. P–44 at M000536; Ex. P–53). In preparation for an August 12, 1998 meeting, Salmon explained, in an August 7, 1998 memorandum to the Board of Directors, that the Summit Bank Loan, at settlement, was approximately $750,000 too high, based upon valuation of the loan servicing portfolio at a 1.44% multiplier, instead of the 1.505% multiplier. (Ex. P–53). The memoran-

---

ceeded in increasing the amount of the warehouse line with PNC Bank to replace the withdrawn warehouse line. (Salmon, April 9, 2001, Tr. at 115.)

**18.** The Portfolio amount used in the Projections ($577,326,513) was based upon the Portfolio's Unpaid Principal Balance as of February 28, 1998. (Ex. D–6; Ex. P–51; Heise, June 6, 2001, Tr. at 16–17.)

dum also stated that New Fidelity had been retaining servicing rights on some of the newly originated mortgage loans to offset the higher than expected Loan Portfolio runoff, even though the business plan for New Fidelity provided that it would sell the servicing rights in the first six months of operations to increase cash flow and cover merger costs. (Ex. P–53; *see also* Salmon, April 9, 2001, Tr. at 84–85; Heise, June 6, 2001, Tr. at 180–83.) In the first week of August 1998, to raise cash, New Fidelity stopped retaining the loan servicing rights. (Salmon, April 9, 2001, Tr. at 85; Heise, June 28, 2001, Tr. at 158.)

In September 1998, as discussed above, the Summit Bank Loan Agreement was amended to remove the $500,000 line of credit from calculation of the Paragraph 6(p)(4) Loan–to–Value Covenant. (Ex. P– 143). This gave New Fidelity the ability to draw down on the $500,000 line of credit. However, New Fidelity did not believe that having the $500,000 line of credit available in September solved its cash problem. (Heise, June 6, 2001, Tr. at 58). Heise testified that New Fidelity paid only those bills that were necessary to keep the company running, while the Board considered the alternatives for New Fidelity's future. (Heise, June 28, 2001, Tr. at 165– 167.)

In the fall of 1998, after Summit Bank received New Fidelity's financial report regarding its financial performance for the period ending September 30, 1998, Summit Bank determined that New Fidelity was in default of the loan covenants. (Marquez, May 7, 2001, Tr. at 47). In December 1998, Summit Bank met with New Fidelity's management and requested that the parties make a capital contribution of approximately $1,500,000 to New Fidelity. (Marquez, May 7, 2001, Tr. at 48–49). However, the requested capital contribution was not made. (*Id.*). On December

22, 1998, Summit Bank declared the Summit Term Loan in default. (JPS, ¶ 20; Ex. P–58).

### (7) *Attempt to sell New Fidelity to Keystone Bank.*

In approximately December 1998, New Fidelity began discussions with Keystone Bank about the sale of New Fidelity. (Salmon, April 6, 2001, Tr. at 15–16.) After a series of negotiations, in February 1999, Keystone Bank made a proposal to purchase substantially all of the assets of New Fidelity for a price that "approached" $10 million dollars. (Salmon, April 6, 2001, Tr. at 16–17, Ex. D–72.) Keystone Bank's proposal was discussed at a meeting of New Fidelity's Board of Directors on or about February 9, 1999. (Salmon, April 6, 2001, Tr. at 27.) Although there was no formal resolution at that meeting, the Board agreed to move forward with the Keystone Bank proposal. (*Id.* at 28.) At that meeting, the Board also reviewed an analysis of the Keystone Bank proposal, prepared by Mr. Heise, showing a potential distribution of the sale proceeds. (*Id.* at 25–26; Ex. D–73.) The analysis showed that there would have been sufficient money from the sale to pay Summit Bank, trade creditors, severance payments or bonuses to employees, and most of the sub-debt owed to the Defendants and former Phoenix shareholders. (Salmon, April 6, 2001, Tr. at 25–27.) However, there would not be sufficient funds to make any distribution to shareholders. (*Id.*)

The shareholders of New Fidelity met on or about February 14, 1999 to try to agree how to split the potential sale proceeds, so that First Republic Bank would receive some payment. (*Id.* at 39–42.) Although the shareholders at the February 14, 1999 meeting reached a tentative agreement, management of First Republic Bank later balked at the arrangement.

(*Id.* at 44–45.) Sometime thereafter, Keystone Bank withdrew its proposal (Salmon, April 6, 2001, Tr. at 240–41.)

### (8) *Bankruptcy Filing.*

On July 6, 1999, New Fidelity filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code. (JPS, ¶ 21).

## DISCUSSION

### A. *The Motion to Reopen Record.*

After trial and the filing of the post-trial submissions in this adversary proceeding, the Defendants filed a motion to reopen the record (docket no. 194) to assert issue preclusion based on determinations made by the District Court in a separate, but related, case, known as *Powell v. First Republic Bank,* 274 F.Supp.2d 660 (E.D.Pa.2003), that was affirmed by the United States Court of Appeals for the Third Circuit in *Powell v. First Republic Bank,* 113 Fed.Appx. 470 (3d Cir.2004). The *Powell* litigation arose out of the Defendants' post-bankruptcy request to file a derivative action on behalf of New Fidelity and its holding company, FBMC, against First Republic Bank and several of its officers. Despite opposition by the Debtor, the Court granted the Defendants' motion.[19]

After dismissal of their first two derivative complaints, the Defendants, on behalf of the Debtor and FBMC, filed a third derivative complaint on February 21, 2002, naming First Republic Bank, Jere Young, George Rapp and Harry Madonna as defendants (the "Republic Defendants"). (Ex. 14 to Debtor's Response to Motion to Reopen Record.) The third derivative complaint asserted four counts for relief: (I) breach of fiduciary duty, (ii) interference with prospective economic advantage, (iii) negligence, and (iv) declaratory relief to disallow the Republic Defendants' claims against the Debtor. (*Id.*) The Republic Defendants filed an answer to the third derivative complaint, which included a counterclaim by First Republic Bank.[20] (Ex. 15 to Debtor's Response to Motion to Reopen Record.) The Bank's counterclaim incorporated its state court complaint against the Defendants, which had been stayed due to the Debtor's bankruptcy filing (the "State Court Complaint"), and which set forth five claims for relief: (I) breach of contract regarding the Letter of Intent and the Definitive Agreement; (ii) breach of contract regarding the Memorandum of Understanding; (iii) fraudulent misrepresentation; (iv) negligent misrepresentation; and (v) punitive damages. (*Id.*).

In *Powell,* the District Court disposed of the entire matter on cross-motions for summary judgment by denying all claims and counter-claims except one, granting summary judgment in favor of First Republic Bank on its counter-claim for the Defendants' breach of the Memorandum of Understanding for failure to pay First Republic Bank $195,000 in reconciliation of

**19.** The Defendants' motion requested two forms of relief: (I) to end the Debtor's exclusivity for filing a plan of reorganization, and (ii) relief from the automatic stay to file a derivative action. By order dated April 12, 2000, my predecessor, Judge David A. Scholl, denied the request to end exclusivity, but granted permission "to file derivative action on behalf of the Debtor against First Republic Bank, Donald Salmon and the Phoenix shareholders. . . ." (*See* Ex. 5 to the Response To Motion To Reopen Record To Assert Issue Preclusion on the Basis of Determinations made by the District Court, docket no. 200 (the "Debtor's Response to Motion to Reopen Record").)

**20.** The answer and counterclaim also included a third-party complaint against Donald Salmon, later dismissed.

the purchase price for the shares of Old Fidelity. *Powell*, 274 F.Supp.2d at 674–75.

In their motion to reopen the record, the Defendants argue that certain issues decided by the *Powell* Court in connection with the counterclaims warrant a preclusive effect in this adversary proceeding. The Debtor disputes the Defendants' issue preclusion arguments, but offers its own issue preclusion argument in response.

■■■■ "Issue preclusion bars relitigation of identical issues adjudicated in a prior action against the same party or a party in privity." *Hitchens v. County of Montgomery*, 98 Fed.Appx. 106, 111 (3d Cir.2004) *citing Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Issue preclusion applies when (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question. *RTC Mortgage Trust v. Quick*, No. 93–2416, 1995 WL 156164, *3 (E.D.Pa. April 10, 1995) *citing Bd. of Trustees of Trucking Emp. Pension Fund. v. Centra*, 983 F.2d 495, 505 (3d Cir.1992).

The Defendants' request for application of issue preclusion must be denied because the legal conclusions asserted by the Defendants did not result from litigating identical issues in the two cases. The issues in this adversary proceeding are not based on breach of contract claims but, instead, are based upon state fraudulent transfer law.

■■■■ The Defendants argue, however, that the *Powell* Court determined that New Fidelity was solvent and that its net worth was $3,084,471 on the date of the Merger. The Defendants' citations, however, are to the *Powell* Court's discussion relating to the post-merger draft audit prepared by Rudolph Palitz in accordance with the LOI. Judge Katz recognized that the parties entered into a Memorandum of Understanding ("MOU") based upon findings set forth in the draft audit report. Judge Katz did not need to analyze whether New Fidelity was solvent on the date of the Merger; therefore, he did not determine whether the draft report's findings were accurate or reliable.[21] Since the solvency issue was not actually litigated or determined on the merits in *Powell*, the Debtor is not precluded from litigating the solvency issue in this proceeding.

The Defendants also argue that issue preclusion applies to the *Powell* Court's conclusion that the decrease in the value of the Debtor's mortgage servicing portfolio was the result of general economic conditions that occurred in the mortgage industry post-Merger. Taken on its own, that finding of fact is unlikely to be disputed by either party; both the Debtor and Defendants admit that lower interest rates caused a substantial runoff in the mortgage servicing portfolio post-Merger. What is relevant to the fraudulent transfer claims is the Debtor's claim that those economic conditions were foreseeable when the parties prepared the projections prior to the Merger. The District Court did not address that issue in *Powell*.

---

21. The *Powell* Court wrote:
 Under the initial merger agreements, accountants would determine the actual net worth of Fidelity following the merger. Because the accountants' findings indicated that selling shareholders overstated Fidelity's net worth at closing and the purchase price was $415,628.00 less than the other parties paid, the Memorandum of Understanding addressed this discrepancy.
 *Powell*, 274 F.Supp.2d at 674.

■ Next, the Defendants argue that Judge Katz's comments in footnote 20, dismissing First Republic Bank's counterclaims for fraudulent misrepresentation as being based on "mere conjecture," should have a preclusive effect in this proceeding. However, the elements of the fraudulent misrepresentation claim, as well as burden of proving such claim by "clear and convincing evidence," are not identical to the elements and standard to be applied in the fraudulent transfer claim especially when, as here, the plaintiff is seeking to avoid a transfer under the constructive fraud provisions of 12 Pa.C.S.A. § 5104(a)(2).[22] The *Powell* Court's dismissal of the fraudulent misrepresentation claim has no preclusive effect in this case. *See Nat'l Railroad Passenger Corp. v. Pennsylvania Public Utility Commission*, 288 F.3d 519, 525 n. 3 (3d Cir.2002) *quoting* Restatement (Second) of Judgments, § 28 (An exception to the general rule of issue preclusion is made when the party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action.); *Mars, Inc. v. Nippon Conlux Kabushiki–Kaisha*, 855 F.Supp. 670, 672–73 (D.Del.1993) *aff'd*, 58 F.3d 616 (Fed.Cir.1995)(Issue preclusion is not ap-

propriate when there was a higher burden of proof in the first action.)

The last issue the Defendants assert as having a preclusive effect here is the *Powell* Court's determination that the MOU was enforceable and, therefore, certain release language contained in the MOU releases the Defendants from any further liability in connection with the purchase price for the Defendants' shares of Old Fidelity in the Merger. The pertinent paragraph of the MOU provides, in part, as follows:

> The Selling Shareholders [i.e., the Defendants] shall pay to the Bank by check (subject to collection) the sum of $195,000 which sum represents the reconciliation of the purchase price pursuant to the terms of the Purchase Agreement and the LOI. The Selling Shareholders shall also pay to White the sum of $8,000 for his share of any such reconciliation. The Company [i.e., FBMC] and all of the shareholders of the Company hereby consent to such payments, and release the Selling Shareholders from any further liability therefor once such payment [sic] is made.

(MOU, Ex. B to Defendants' Motion to Reopen Record, ¶ 4.) Even assuming that

---

**22.** The *Powell* Court dismissed the fraudulent misrepresentation claim for being brought outside the two-year statute of limitations. (*Powell*, 274 F.Supp.2d at 677.) However, in footnote 20, the Court alternatively concluded that summary judgment would be granted against First Republic Bank even if it had been raised timely. (*Id.* at 678, n. 20). The *Powell* Court wrote:

> In order to establish fraudulent misrepresentation, a complainant must prove by clear and convincing evidence 1) a misrepresentation; 2) a fraudulent utterance thereof; 3) an intention by the maker that the recipient will thereby be induced to act; 4) justifiable reliance by the recipient upon the misrepresentation; and 5) damage to the recipient as the proximate result. Al-

though the Bank and its representatives may speculate that the [Defendants] intentionally misrepresented the value of the servicing portfolio in order to induce the Bank to purchase the company, mere conjecture fails to establish the elements of fraud by clear and convincing evidence.

*Powell*, 274 F.Supp.2d at 678, n. 20. These elements and the burden of proof standard are not identical to the issues to be addressed *infra*. in the Debtor's constructive fraud claim. *See Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.)*, 280 B.R. 103, 115 (Bankr.E.D.Pa.2002)(In a constructive fraud proceeding brought under 12 Pa. C.S.A. § 5104(a)(2), the plaintiff carries the burden of proof on all elements by a preponderance of the evidence standard.)

there is privity between the Debtor and First Republic Bank,[23] and the District Court's decision regarding enforceability of the MOU has a preclusive effect upon this proceeding, the release included therein is not the broad release asserted by the Defendants.

 Under Pennsylvania law, which governs the MOU (Ex. B to Defendants' Motion to Reopen Record, ¶ 13), the effect of a release must be determined from the ordinary meaning of its language. *Hanselman v. Consolidated Rail Corp.*, 158 Pa.Cmwlth. 568, 632 A.2d 607, 609 (1993). The pertinent paragraph of the MOU, quoted above, provides that the Defendants shall pay $195,000 to First Republic Bank "which represents the reconciliation of the purchase price pursuant to the terms of the Purchase Agreement and the LOI" and further provides that, upon payment, FBMC and its shareholders "release the [Defendants] from any further liability therefor once such payment is made." As the *Powell* Court recognized, this paragraph in the MOU relates to the LOI, which required the parties to reconcile the purchase price post-merger after the accountants determined the actual net worth of Old Fidelity. *Powell*, 274 F.Supp.2d at 674. The plain language of this paragraph limits the release to any further liability for adjusting the purchase price for the Old Fidelity stock based on the company's actual net worth pursuant to the procedure established by the parties. The release is

not general or broad enough to include the release of fraudulent transfer claims and recharacterization/equitable subordination claims raised in this proceeding. *See Bowersox Truck Sales and Serv., Inc. v. Harco Nat'l Ins. Co.*, 209 F.3d 273, 280 (3d Cir. 2000) *quoting Restifo v. McDonald*, 426 Pa. 5, 230 A.2d 199, 201 (1967)("Releases are strictly construed 'so as to avoid the ever present possibility that the releaser may be overreaching.' ")

In response to the Defendants' motion to reopen, the Debtor asserts its own issue preclusion argument, contending that the *Powell* decision bars any conclusions proposed by the Defendants in connection with the failed sale of New Fidelity to Keystone Bank.[24] The Defendants argue, however, that the Keystone Bank issues are not identical in this proceeding. Instead of alleging that certain parties were responsible for the termination of the Keystone Bank transaction, the Defendants ask this Court to consider Keystone Bank's offer to purchase the Debtor for $9.8 million dollars in the context of the solvency determination. I agree with the Defendants. Because the issues are not identical, issue preclusion will not apply here.

**B. Counts I and IV of the Debtor's Complaint: Avoidance and Recovery of Fraudulent Transfers.**

 The Debtor argues that the Distribution and the Promissory Notes given to

---

**23.** The Defendants assert privity between First Republic Bank and the Debtor because the Debtor's Board of Directors consisted entirely of the officers of First Republic Bank at the time this adversary proceeding and the *Powell* action were filed. Because I conclude that issue preclusion will not apply regardless of privity, I need not decide that issue.

**24.** More specifically, the *Powell* Court rejected the Defendants' claims against the Republic Defendants of negligence and interference

with prospective economic advantage for allegedly causing the proposed sale of FBMC to Keystone to fail. The Judge determined that "there is no evidence before the court that the [Republic Defendants'] actions extinguished the Keystone transaction" (*Powell*, 274 F.Supp.2d at 672) and that the Defendants offered "no evidence to establish that 'but for' the [Republic Defendants'] actions, Keystone would have purchased FBMC" (*Id.* at 672–73).

the Defendants on or about April 30, 1998 constitute fraudulent transfers under § 5104 and § 5105 of PUFTA, which state, in pertinent part, as follows:

## § 5104. Transfers fraudulent as to present and future creditors.

(a) **General rule.**–A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

## § 5105. Transfers fraudulent as to present creditors.

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa.C.S.A. §§ 5104, 5105 (2006).

The Distribution clearly falls within the definition of a "transfer" in the statute since it was the "payment of money" from Old Fidelity to the Defendants. 12 Pa. C.S.A. § 5101.[25] The Promissory Notes were originally given to the Defendants by FBMC as part of the Merger, but the Debtor immediately became a co-obligor on the Notes.[26] Therefore, the Promissory Notes will be treated as an obligation incurred by the Debtor for analysis under PUFTA. *See MFS/Sun Life Trust—High Yield Series v. Van Dusen Airport Services Co.*, 910 F.Supp. 913, 934 (S.D.N.Y. 1995)(The court treated various steps of a leveraged buy-out as a single transaction when all parties to each subsidiary transfer were aware of the overall leveraged buyout, writing: "[A]n allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *quoting Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993)(internal quotations and citations omitted)).

 Under the constructive fraud provisions of PUFTA, set forth above, the Debtor must prove, as a preliminary mat-

---

**25.** 12 Pa.C.S.A. § 5101 defines "transfer" as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset. The term includes payment of money, release, lease and creation of a lien or other encumbrance."

**26.** Exhibit P–423 shows the Assumption Agreements dated May 1, 1998 between FBMC and the Debtor under which the Debtor agreed to assume the obligations under the Promissory Notes in consideration for FBMC's agreement to pay the Debtor $10,000 for each Promissory Note assumed.

ter, that it did not receive "reasonably equivalent value" in return for making the Distribution and incurring the obligation evidenced by the Promissory Notes.[27] Because "the purpose of fraudulent conveyance law is to protect creditors, the determination of value is looked at from the vantage point of the debtor's creditors. Thus, the inquiry focuses on what did the debtor give up and what did it receive that could benefit creditors." *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 75 (Bankr.N.D.Ill.2002). *See also Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir.1991) ("The purpose of the [fraudulent transfer law in Bankruptcy Code § 548] is estate preservation; thus, the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors."); *In Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 136 (Bankr. D.Mass.1989)(In evaluating "reasonably equivalent value" as used in Bankruptcy Code § 548(a)(2)(A), the court made two inquiries: first, whether the debtor, not some third party, received the required value; and second, "unlike the doctrine of consideration in contract law, that value must pass a measurement test.")

The Merger was a form of leveraged buyout ("LBO"). In *Mellon Bank*, the Third Circuit Court of Appeals described LBOs as follows:

Although the formal structure of LBOs may differ, the substance of LBOs follow a general pattern. A leveraged buyout refers to the acquisition of a company ("target corporation") in which a substantial portion of the purchase price paid for the stock of a target corporation is borrowed and where the loan is secured by the target corporation's assets. Commonly, the acquirer invests little or no equity. Thus, a fundamental feature of leveraged buyouts is that equity is exchanged for debt.

*Mellon Bank*, 945 F.2d at 645. Here, just prior to the Merger, the Debtor encumbered virtually all of its assets in return for the Summit Term Loan, and used some of the loan proceeds to provide the Distribution to the Defendants. "Because the assets of the target are pledged as security for a loan that benefits the target's former owners rather than the target itself, it is unlikely that any LBO can satisfy fair consideration requirements." *MFS/Sun Life Trust*, 910 F.Supp. at 937. In this case, the Debtor obtained a term loan of $7 million dollars and paid off $4,905,241.16 in previous loans and a $70,000 loan commitment fee to Summit Bank. After payment of the Distribution of $1,705,000, the Debtor was left with a $7 million dollar term loan and loan proceeds of $319,758.84.

The Debtor did not receive any direct value in return for the Distribution to the Defendants. Other courts have held that a dividend or reduction in capital through the purchase of stock adds no value for creditors. *See Financial Institutional Funding, Inc. v. Official Committee of Unsecured Creditors of GenFarm Ltd. (In re Buncher Co.)*, 229 F.3d 245, 252–53 (3d Cir.2000)(affirming the bankruptcy court's conclusion that, from the creditors' perspective, a partnership receives less than reasonably equivalent value when it redeems the equity interest of its principals); *See also Shubert v. Dawley (In re Dawley)*, Adv.No. 02–0332, 2005 WL 2077074, *13–*14 (Bankr.E.D.Pa. Aug.10, 2005); *Liebersohn v. Campus Crusade for Christ (In re C.F. Foods, L.P.)*, 280 B.R. 103, 113–15 (Bankr.E.D.Pa. 2002).

---

**27.** For the reasons stated on the record at trial on April 9, 2001 (*see* April 9, 2001, Tr. at 59—68), I concluded that the Debtor has the burden of proving all elements of constructive fraud by a preponderance of the evidence standard under § 5104 and § 5105 of PUFTA.

*Joy Technology,* 286 B.R. at 75 ("[S]tock redemptions are treated as dividends to shareholders which return no value to the company." *citing Vadnais Lumber,* 100 B.R. at 136.).

In return for its agreement to assume the obligations of the Promissory Notes, which totaled $2,100,000, the Debtor received a promise of payment in the sum of $110,000 from FBMC. (*See* Ex. P–423). Such as promise does not amount to reasonably *equivalent* value, especially from the creditors' perspective.

██ Furthermore, I must consider whether the Debtor derived "indirect economic benefits" in exchange for the Distribution and/or the obligation under the Promissory Notes. *See Mellon Bank,* 945 F.2d at 646–47 (deciding that, when considering reasonably equivalent value, it is appropriate to compare the value of indirect economic benefits received to the obligations incurred by the debtor). As a result of the Merger, the Debtor expected to receive economic benefits resulting from the synergies of combining Phoenix and Old Fidelity (including Phoenix's originations platform, staff, and management), as well as synergies arising from the relationship with First Republic Bank (including the ability to market to its customer base and contacts). In *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.),* the Third Circuit Court of Appeals employed a two-step process to determine whether a debtor received "reasonably equivalent value" in the form of indirect economic benefits; first, whether *any* value is received, and second, whether that value was "reasonable equivalent" to the transfer made. *R.M.L., Inc.,* 92 F.3d at 152. Relying upon the *Mellon Bank* case, the *R.M.L.* Court recognized that investments that fail can confer value, holding:

We held [in *Mellon Bank*] that the mere expectation that the fusion of two companies would produce a strong synergy (an expectation that turned out to be inaccurate in hindsight) would suffice to confer "value" so long as the expectation was *"legitimate and reasonable."* ... Thus, so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred.

*R.M.L.,* 92 F.3d at 152 (emphasis in original). In this case, the Debtor received value in connection with the Merger in the form of the anticipated synergies.

██ To determine whether that value is "reasonably equivalent" to the transfer made, a court can rely on the "totality of the circumstances," by looking at factors such as fair market value compared to the actual price paid, the arm's-length nature of the transaction, and the good faith of the transferee. *R.M.L.,* 92 F.3d at 145, 153. A court may also measure the "amount" of value conferred by considering the amount of risk associated with the deal. *See R.M.L.,* 92 F.3d at 153 (The *R.M.L.* Court decided that the chance of receiving an economic benefit can confer "value" upon a debtor, but "the size of the chance is directly correlated with the amount of 'value' conferred.")

Although the Merger involved an arm's length transaction among sophisticated business entities, the decision to make the Distribution was not made jointly by the parties, but by the Defendants prior to the Merger. The Distribution added a layer of risk to the Merger. Because of this added risk, the speculative indirect economic benefits were not reasonably equivalent to the amount of over $3 million dollars that was transferred to the Defendants. Therefore, the Debtor did not receive reasonably equivalent value in

return for the Distribution and the obligations under the Promissory Notes.[28]

After determining that the Debtor did not receive reasonably equivalent value, the next step in the fraudulent transfer analysis requires the Debtor to prove either of the following: (I) that the Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; (ii) that the remaining assets of the Debtor were unreasonably small in relation to the business in which the Debtor was engaged in or about to become engaged; or (iii) that the Debtor reasonably should have believed that it would incur debts beyond its ability to pay as they came due. 12 Pa.C.S.A. § 5105, § 5104.

*(1) Insolvency Analysis.*

■ The definition of insolvency set forth in PUFTA provides that "A debtor is insolvent if, at fair valuation, the sum of the debtor's debts is greater than all of the debtor's assets." 12 Pa.C.S.A. § 5102(a). This is also known as the "balance sheet test" for insolvency, which is the same under the Bankruptcy Code. *Joy Recovery,* 286 B.R. at 77; 11 U.S.C. § 101(32).

Both parties engaged experts, who opined about the Debtor's solvency as of the date of the merger.[29] Both experts used the consolidated balance sheet for the Debtor, as of April 30, 1998, included in the draft audit report prepared by Rudolph, Palitz & Co. (Ex. P–56)(the "Draft Audit Balance Sheet"), as the starting point for preparing their analyses. That balance sheet reflected that, on April 30, 1998, the Debtor had total assets of $37,363,870, and total liabilities of $34,279,499 for a net worth of $3,084,371. In an effort to determine the fair market valuation of the Debtor's assets and liabili-

**28.** A recent decision by the Third Circuit Court of Appeals discussed the issue of determining reasonably equivalent value in the Bankruptcy Code fraudulent transfer provisions (11 U.S.C. § 548(a)(1)). *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.),* No. 05–1374, 2006 WL 933404 (3d Cir. April 12, 2006). In its discussion, the *Fruehauf* Court decided that "where the value of an intangible benefit *could* equal or exceed the value surrendered by the debtor, precise calculations are essential to allow the court to determine equivalency properly." *Fruehauf,* 2006 WL 933404 at *10 (emphasis in original). Yet, the *Fruehauf* Court further decided that precise calculations were not *always* necessary, writing:

> But this general rule yields to common sense: in those cases where a court has sufficient evidence to conclude, based on a totality of circumstances, that the benefits to the debtor are minimal and certainly not equivalent to the value of a substantial outlay of assets, the plaintiff need not prove the precise value of the benefit because such a calculation is unnecessary to the court's analysis.

*Id.* The evidence here is not sufficient to conclude that the indirect benefits were "minimal" or "certainly not" the equivalent of the combined Distribution and Promissory Notes ($3,805,000). The Debtor does, however, offer some calculations that cast sufficient doubt upon the value of any synergies by arguing that the Merger left the Debtor with an additional $2.8 million dollars of secured indebtedness and a line of credit that was not accessible immediately. The Debtor also argues that the net worth of Old Fidelity was less than bargained for. All of these items added to the Merger's risk and decreased the chances that the new entity would recognize value from the synergies. While not precise, I conclude that the Debtor has provided adequate evidence supporting its burden of proving that the indirect benefits did not provide reasonably equivalent value for the Distribution and Promissory Notes.

**29.** The parties' experts were George L. Miller for the Debtor ("Miller") and Ronald Greenspan for the Defendants ("Greenspan"). The parties' moved expert reports and rebuttal reports into evidence, including Miller's report (Ex. P–63), a Miller's rebuttal report (Ex. P–66), and Greenspan's report. (Ex. D–81).

ties, both experts made various adjustments to the balance sheet line items to arrive at their starkly different conclusions regarding the Debtor's solvency or insolvency.[30] A comparison of the experts' fair market analyses, compared to the Draft Audit Balance Sheet is as follows:

| | Draft Audit Balance Sheet 4/30/98 | Miller Fair Value Analysis | Greenspan Fair Value Analysis |
|---|---|---|---|
| **ASSETS** | | | |
| *Current Assets* | | | |
| Cash | $ 611,918 | $ 611,918 | $ 611,918 |
| Servicing Adv. | $ 278,237 | $ 278,237 | $ 278,237 |
| Mortg. held for sale | $24,761,219 | $24,566,098 | $24,761,219 |
| Real Estate Owned Prop | $ 37,637 | $ 37,637 | $ 37,637 |
| Prepaid Exp. and other current assets | $ 359,179 | $ 266,100 | $ 266,100 |
| Due from selling stockholders | $ 203,657 | $ 0 | $ 203,657 |
| | | | |
| Total Current Assets | $26,251,847 | $25,759,990 | $26,158,768 |
| | | | |
| *Other Assets* | | | |
| Loans held for investment | $ 116,606 | $ 116,606 | $ 116,606 |
| Property and equipment | $ 1,129,000 | $ 793,000 | $ 1,064,000 |
| Mortgage servicing rights | $ 8,532,941 | $ 7,975,362 | $ 8,671,989 |
| Allowance for MSR runoff | | $ (367,258) | |
| Unamortized loan costs | $ 70,000 | $ 0 | $ 0 |
| Goodwill | $ 1,263,476 | $ 455,415 | $ 0 |
| *Total Other Assets* | $11,112,023 | $ 8,973,125 | $ 9,852,595 |
| | | | |
| **TOTAL ASSETS** | $37,363,870 | $34,733,115 | $36,011,363 |
| | | | |
| **LIABILITIES** | | | |
| *Current Liabilities* | | | |
| Warehouse Lines Payable | $23,387,746 | $23,387,746 | $23,387,746 |
| Notes Payable | $ 7,011,527 | $ 7,011,527 | $ 7,011,527 |
| Due to Shareholders | $ 831,073 | $ 831,073 | $ 831,073 |
| Accts payable and accrued expenses | $ 1,616,191 | $ 1,616,191 | $ 1,616,191 |
| Deferred Taxes | $ 264,425 | $ 264,425 | $ 264,425 |
| Current lease Obligations | | $ 426,525 | |

**30.** The Committee Comments to § 5102 of PUFTA (regarding insolvency) state, in pertinent part, that:

> For a debtor which is a business enterprise, values shown on a balance sheet prepared in accordance with generally accepted accounting principles ("GAAP") generally would not be fair valuations as that term is used in this section. Such a balance sheet will have been prepared in accordance with accounting conventions that do not for the most part purport to reflect fair valuations (in any sense), nor will such a balance sheet necessarily reflect all of the debtor's assets and debts as defined in this chapter. For example, asset values under GAAP in most cases are based on historical costs rather than current fair valuations, and accounting conventions may ignore or relegate to footnotes certain assets and debts that should be taken into account in determining fair valuation, such as, for example, valuable contracts and leases, contingent assets and liabilities, and goodwill arising from operations. In some cases, however, a GAAP balance sheet may serve as a useful starting point in analyzing whether a debtor is insolvent, given suitable adjustments to the values of particular line-items and addition or deletion of line-items.

12 Pa.C.S.A. § 5102, Committee Comment—1993, No. 1 (1999 Main Volume).

| | Draft Audit Balance Sheet 4/30/98 | Miller Fair Value Analysis | Greenspan Fair Value Analysis |
|---|---|---|---|
| Tax Liability | | $ 616,357 | |
| *Total Current Liabilities* | *$33,110,962* | *$34,153,894* | *$33,110,962* |
| Subordinated Debt | $ 956,154 | $ 2,467,497 | $ 956,154 |
| Notes payable | $ 86,527 | $ 86,527 | $ 86,527 |
| Deferred Taxes | $ 125,856 | $ 125,856 | $ 125,856 |
| **TOTAL LIABILITIES** | $34,279,499 | $36,833,774 | $34,279,499 |
| **Assets minus liabilities** | $ 3,084,371 | $ (2,100,659) | $ 1,731,864 |

The Debtor's expert, George Miller, determined that the Debtor was insolvent on April 30, 1998, with total assets of $34,733,115, and total liabilities of $36,833,774, for a negative net worth of $2,100,659. (Ex. P–66, attached exhibit E.) The Defendants' expert, Ronald Greenspan, determined that the Debtor was solvent on that date, with total assets of $36,011,363, total liabilities of $34,279,499, for a positive net worth of $1,731,864. (Ex. D–81, attached exhibit C–2).

I disagree with various adjustments made by Miller. After consideration of the record and, for the reasons that follow, I conclude that the Debtor was solvent on the date of the Merger.

(a) *Adjustments to the Debtor's Liabilities.*

Both Miller and Greenspan adjusted the value of the Debtor's assets in preparing their insolvency analyses, but only Miller adjusted the amount of the Debtor's liabilities. I begin by reviewing those increases to the liabilities. Miller's largest increase to the Debtor's liabilities is to Subordinated Debt. The auditors and Greenspan both list this amount as $956,154.[31] Miller, however, lists the amount as $2,467,497. Miller testified that the increase is based upon his conclusion that the Debtor should repay the amount of $1,715,000 (i.e., the purchase price) to the buying shareholders.[32] (Miller, Sept. 20, 2001, Tr. at 53.) The LOI and Definitive Agreement required the Debtor to have a net value within a range of $2.5 million and $4.5 million dollars, but Miller's analysis shows the Debtor had no net value on the date of the Merger. (Miller, Sept. 20, 2001, Tr. at 54–55). Therefore, Miller determined that "the entire transaction would have been unwound" and the Debtor needed to repay First Republic Bank and Ronald White. (*Id.*)

Greenspan criticized Miller's adjustment of the subordinated debt for a number of reasons. First, he stated that his review

31. The amount of $956,154 is the subordinated debt due from the Debtor and FBMC to the Defendants as a result of the Merger. (Ex. P–56, at 11). The face value of the Promissory Notes was $2,100,000, but in preparing the draft audit report to determine the Debtor's net worth on date of the Merger, Rudolph Palitz adjusted the value of those notes.

32. The difference between $956,154 and $2,467,497 is $1,511,343. Based upon my review of the record, it appears Miller deducted the amount of $203,657, which is due to the Debtor from the selling shareholders. By adding $1,511,343 and $203,657, I arrive at the total debt of $1,715,000 which Miller believes should be repaid to the buying shareholders.

of the Debtor's books and records showed that the company never recorded such an obligation and the buying shareholders never made a claim for this amount. (Greenspan, Feb. 6, 2002, Tr. at 83–87). Second, he opined that if, for some reason, the Merger was unwound, then the obligation would be due from the selling shareholders to FBMC. (*Id.*). The Debtor never received payment for the sale of stock that Miller seeks to be returned. Greenspan also noted that the there are no grounds for unwinding the Merger under the LOI and the Definitive Agreement, because the parties agreed to adjust the purchase price based upon a post-merger audit by Rudolph Palitz, and the draft audit showed a net worth of over $3 million dollars. (*Id.*). While the purchase price should be adjusted, there are no grounds for unwinding the entire Merger. I agree with Greenspan and conclude, for all of those reasons, that the subordinated debt liabilities should not be increased.

Miller also included a deferred tax liability of $616,357 in his analysis that neither the auditors nor Greenspan included on their balance sheets. Miller explained that the tax liability was an obligation the Debtor would have realized on the liquidation of its assets based upon the amount of his fair value assessment. (Miller, Sept. 20, 2001, Tr. at 49–50.) Greenspan agreed that consideration of potential deferred tax liabilities is very important when preparing a fair value analysis of a company. (Greenspan, Feb. 6, 2002, Tr. at 76–77.) However, Greenspan did not include a deferred tax liability in his analysis because FBMC and the selling shareholders made a valid election under 26 U.S.C. § 338(h)(10)(Ex. D–65; Ex. D–97), which is a basis election that eliminates the tax liability for the company and causes the shareholders, not the Debtor, to bear the tax liability. (Greenspan, Feb. 6, 2002, Tr.

at 76–78; Miller, Sept. 20, 2001, Tr. at 50; Brand, Dec. 19, 2001, Tr. at 110–114.)

Miller testified, however, that he was determining the fair value of the assets and liabilities as April 30, 1998, and, based upon his review of the books and records, it was not foreseeable on that date that the § 338 election would be made. (Miller, Sept. 20, 2001, Tr. at 50–52). Although the parties had discussed the possibility of filing a § 338 election, there was no obligation for the Defendants to do so under the merger documents and the Debtor filed a tax return post-merger that did not utilize the § 338 election. (*Id.*)

Greenspan, on the other hand, testified that from the date of the merger the Debtor recorded the stepped up value of its assets and did not show any deferred tax liability. (Greenspan, Feb. 6, 2002, Tr. at 78–79). He further testified that parties prepared their projections on the assumption that the election would be filed and the Debtor had "a general ledger audit showing the filing of the 338(h)(10) election and the appropriate recordation of that on the books and records of the company." (Greenspan, Feb. 6, 2002, Tr. at 78–79). While there may have been some question about whether the selling shareholders could be forced to file the § 338 election, they did so. I find Greenspan's view to be more persuasive. Based upon the record and my review of the experts' conflicting opinions, I conclude that it is not appropriate to include the deferred tax liability on the Debtor's fair value balance sheet.

(b) *Adjustments to the Debtor's Assets.*

In calculating fair market value of the assets, both Miller and Greenspan adjusted values. The experts reduced the value of the prepaid expenses to the same amount, and reduced the value of the unamortized loan costs to zero. However,

Miller also reduced the value of other assets, which Greenspan either did not adjust or changed differently. I will focus on the differences in their adjustments to the mortgages held for sale, amount due from the shareholders, and the mortgage servicing rights.

The "mortgages held for sale" refers to those mortgages originated by the Debtor and intended for sale in the secondary market. (Ex. P–56 at 5). Miller reduced the value of that asset by $195,121. Greenspan did not adjust the value from the auditor's report. The value of the mortgages held for sale is made up the principal amount of the mortgages, a percentage of mortgages that are "in the pipeline" (or not yet closed), and the "FAS 91" costs, which are costs incurred by Fidelity in originating the loans. (Greenspan, Feb. 6, 2001, Tr. at 38–39). Miller testified that the costs should be deducted from the value of the loans to arrive at a net value. (Miller, Dec. 10, 2001, Tr. at 167–68.) Greenspan agreed that Miller was technically correct in concluding that the costs, which equaled about 1% of the loan value, would decrease the loans' value. (Greenspan, Feb. 6, 2001, Tr. at 40.)

However, Greenspan also testified that Phoenix was very successful in originating and selling loans for about 2.6% above their face value. (*Id.*). But rather than add 2.6% to the face value of the loans to arrive at their market value, Greenspan decided that a more conservative approach was to leave the loans' value "as is" without deducting the costs. (*Id.*) Miller admitted that the loans were sold at a

premium, but believed that the cost of liquidating the loans would offset any premium. (Miller, Dec. 10, 2001, Tr. at 106–07.) Treating the costs and the premium as a "wash" is the most sensible for this particular analysis. Therefore, I conclude the value of the mortgages held for sale should not be adjusted from the auditors' report.

Miller's next adjustment was to reduce the amount due from the selling shareholders ($203,657) to zero. This asset reflects the amount due from the selling shareholders based upon the post-Merger audit to determine Old Fidelity's net worth. Miller determined that the amount was uncollectible, since the Defendants were refusing to pay. (Miller, Sept. 20, 2001, Tr. at 29–30). However, Greenspan explained that the payment due of $203,657 was not really an asset of the Debtor, because this amount, if collected, would be paid to FBMC. (Greenspan, Feb. 6, 2001, Tr. at 42–45). Greenspan did not remove the amount, however, because the auditors treated it as an asset *and* a liability, by including that amount in the total liability of $831,073 due to shareholders. (*Id.*). Greenspan stated that his treatment of the amount due was neutral, while Miller deducted the amount from the assets column without making a corresponding deduction to the amount due to shareholders in the liabilities, thereby understating the Debtor's net worth of $203,657.[33] (*Id.*) Greenspan's treatment is more logical and is consistent with the auditors' treatment. Therefore, I conclude the amount of

---

**33.** Miller did allow for a deduction of the $203,657 when he added only $1,511,343 (instead of the full $1,715,000) to the subordinated debt liability for the purpose of "unwinding" the Merger. Because I have already determined that it is not appropriate to add $1,715,000 to the subordinated debt, the offset to the subordinated debt has no affect. If

the amount of $203,657 is removed as an asset, a corresponding deduction must be taken against the liability "due to shareholders" so that the $203,657 obligation receives "neutral treatment" on the balance sheet. This should not be deducted from the assets or the liabilities and should remain as stated in the auditors' draft report.

$203,657 should not be deducted from the total assets.

The Debtor's Mortgage Servicing Rights were valued at $8,532,941 in the Draft Audit Balance Sheet, by utilizing the multiplier of 1.5005 against the unpaid principal balance of the mortgage servicing portfolio as of the date of the Merger. (Miller, Sept. 20, 2001, Tr. at 39; Greenspan, Feb. 6, 2002, Tr. at 49–50).[34] Miller used a lower multiplier of 1.3866 and valued the Mortgage Servicing Rights at $7,975,362. (Miller, Sept. 20, 2001, Tr. at 40–41). Miller used a multiplier falling within the midpoint of the Prestwick evaluation because, among other things, he determined that the Debtor's rate of runoff and costs for servicing the loans were higher than those assumed in the Prestwick report. (*Id.*)

Miller's balance sheet also deducted $367,258 from the value of the Mortgage Service Rights as an "allowance for MSR runoff." This figure was based upon the assumption that, in a liquidation sale, a buyer would want a credit for the value of the runoff for the first 60 to 90 days after the purchase. (Miller, Sept. 20, 2001, Tr. at 42–44; Greenspan, Feb. 6, 2002, Tr. at 59–60.) Miller's decision to include this deduction was based upon his experience in liquidating mortgage servicing portfol-

ios. (Miller, Sept. 20, 2001, Tr. at 42.) Greenspan disagreed with Miller's additional deduction for runoff for a number of reasons. In his experience with valuing mortgage servicing rights for solvency analysis purposes, Greenspan had never seen this done before. (Greenspan, Feb. 6, 2002, Tr. at 60.) He believed it would create a "slippery slope" in adjusting values to account for post-closing benefits or burdens in connection with other assets and liabilities. (*Id.* at 60–61.) Moreover, Greenspan noted that the multiplier is determined in part by anticipating an annual rate of run-off. (*Id.* at 63.) By using a lower multiplier and then deducting a further amount as an "allowance for runoff," Miller penalized the Debtor twice for its portfolio runoff. I conclude that the double reduction is not appropriate and, therefore, the deduction in value should not have been taken.

### (c) *Insolvency summary.*

Relying upon the experts' valuations, including the revisions to Miller's balance sheet as described above, I conclude that the Debtor was solvent on the date of the Merger in a range between $793,218 and $1,731,864.[35]

**34.** The 1.5005 multiplier was taken from the Prestwick evaluation of the "market value" of Old Fidelity's loan servicing portfolio as of January 26, 1998. (*See* JPS, ¶ 9) Prestwick estimated that the range of "market value" for the loan servicing portfolio being serviced as of December 31, 1997, fell between 1.2727% and 1.5005%, multiplied by the total unpaid principal balance of the loans in the loan servicing portfolio.

**35.** The total assets in Miller's balance sheet were adjusted by adding the following amounts: $195,121 (mortgages held for sale), $203,657 (due from selling shareholders), and $367,258 (allowance for MSR runoff). The total liabilities in Miller's balance sheet was

adjusted by deducting $1,511,343 (subordinated debt) and $616,357 (tax liability). There may be additional adjustments that would be appropriate and that would increase the amount by which the Debtor was solvent.

Of course, the solvency result does not change if secured debt and assets (to the extent they are "encumbered by a valid lien") are taken out of the equation based upon § 5102(d) and (e) and the definition of asset in § 5101. By removing the secured debts, "warehouse lines payable" of $23,387,746 and "notes payable" of $7,011,527, the Debtor shows net assets of $5,099,969 less net liabilities of $4,306,751 and remains solvent by the amount of $793,218.

(2) *Unreasonably Small Assets Analysis.*

 The unreasonably small assets test set forth in § 5104(a)(2)(I) of PUFTA denotes a financial condition short of insolvency, and instead considers whether the transfer in question left the Debtor with an "inability to generate sufficient profits to sustain operations." *Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1070 (3d Cir.1992). *See also Joy Technology,* 286 B.R. at 76 ("[U]nreasonably small capital means something more than insolvency or inability to pay debts as they come due. Being left without adequate capital would mean that the transaction in issue put [the debtor] on the road to ruin."); *MFS/Sun Life Trust,* 910 F.Supp. at 944 ("The test is aimed at transferees that leave the transferor technically solvent but doomed to fail.").

 The critical question for determining whether parties to a leveraged buy-out left a business with unreasonably small assets is whether it was *reasonably foreseeable* that an acquisition would fail. *Moody,* 971 F.2d at 1073. This requires analysis of whether the parties' projections were reasonable. *Id.* "[A] court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made." *MFS/Sun Life Trust,* 910 F.Supp. at 944. The record here established that the parties undertook a substantial amount of due diligence in preparing the Projections.[36] (*See* Ex. P–15, at 12.) The parties testified that they spent countless hours preparing and revising the Projections. (Salmon, April 6, 2001, Tr. at 92–93; Ex. P–198; Heise, June 6, 2001, Tr. at 16–17; Brand, June 19, 2002, Tr. at 93–97.) Other witnesses who reviewed the Projections testified as to their belief that the assumptions underlying the Projections were reasonable at the time they were prepared. (Rapp, April 12, 2001, Tr. at 150–51; Heise, June 6, 2001, Tr. at 151–52.)

Despite this, the Debtor argues that the Projections were unreasonable because they did not accurately reflect the true nature of the companies being merged and did not adequately prepare for difficulties that were likely to arise. In fact, the Debtor argues, the Projections were inaccurate from the first day it began operations after the Merger because:

(a) the Projections assumed an opening net worth between $4 million and $4.5 million, but the draft audit by Rudolph, Palitz determined that the actual net worth was less then $3.1 million;

(b) the Projections assumed that Old Fidelity's Mortgage Servicing Portfolio had an unpaid principal balance of no less than $577,326,513, yet the actual balance on the first day was $549,774,000 (or $565,970,269 if Phoenix's portfolio is added);

(c) the Projections assumed that the existing portfolio would have a runoff rate of 12.5% per year; but the actual rate, annualized, at the time of the Merger was between 20–23%;

(d) the Projections assumed stable interest rates, although interest rates had declined over one percentage point in the preceding year;

(e) the Projections valued the Mortgage Servicing Portfolio by using a multiplier of 1.5% of the unpaid principal balances; although Summit Bank

---

**36.** The Projections, which were revised a number of times, were introduced into evidence as Exhibit D–6.

was valuing the Portfolio by using a multiplier of 1.44%; and

(f) the Projections assumed that New Fidelity would have $500,000 cash and a $500,000 line of credit upon completion of the Merger, but the amount of cash fell immediately from $611,918 to $312,000 and the Debtor did not have access to the $500,000 line of credit until September 1998.

The Debtor further argues that all of these inaccuracies were foreseeable to the parties prior to the Merger, especially to the Defendants, who were the sole owners and directors of Old Fidelity until the Merger was complete.

The parties to the Mergers, however, understood that the Projections were not guaranteed and that market conditions could affect the financial condition of the companies. (Salmon, April 6, 2001, Tr. at 130). To guard against unexpected changes, the LOI and Definitive Agreement set boundaries within which the financial condition must fall for the deal to move forward. (*Id.*) Accordingly, while the examples of deviations from the Projections cited above may have turned out to be correct, those changes do not outweigh the evidence which showed that the Projections were reasonable when made; more specifically:

(a) The Projections' estimate of the Debtor's net worth as of the Merger was consistent with the acceptable range set in the LOI (which required the net worth would not be "less than $2,500,000 nor more than $4,500,000"). Even though it was later determined that the opening net worth of the Debtor was less than $3.1 million, the parties' agreement had a mechanism in place to adjust the price if the net worth of the Debtor was less than anticipated,

which required the Defendants to repay part of the purchase price.

(b) The LOI also set a floor of $500,000,000 of mortgages in the loan servicing portfolio on the closing date (Ex. P–1, at 10) and the parties reasonably projected an opening balance of $577,326,513 for the combined portfolio of Old Fidelity and Phoenix (Salmon, April 6, 2001, Tr. at 106; Greenspan, Feb. 6, 2002, Tr. at 120) based upon historical data and runoff rates; moreover, an attachment to Exhibit P–44 (a memo prepared by the Debtor) shows a combined portfolio on May 1, 1998 in the amount of $574,771,986. At any rate, the difference of less than $12 million between the projected combined portfolio and the actual combined portfolio now cited by the Debtor ($565,970,269) on the first day would not have a substantial impact on the Debtor's ability to operate.

(c) Earlier drafts of the Projections set the runoff rate for the mortgage service portfolio at 8% or 9%, and then the parties "shocked" the runoff rate up to 12.5% in the April 20, 1998 Projections (Ex. D–6, Salmon, April 6, 2001, Tr. at 107–08, 110–12). The change in runoff rate was due to the parties' perception that runoff rates were increasing and was based upon the Prestwick evaluation of the Portfolio, which projected a 12.5% runoff. (Greenspan, Feb. 6, 2002, Tr. at 117–18.) The Debtor argues that the parties should have used the "actual" runoff rate as of April 1998. The testimony showed that interest rates, which had dropped between December 1997 and January 1998, were stabilizing in the first four months of 1998, which would indicate that the

high prepayment rate fueling the run-off would begin to slow down. (Greenspan, Feb. 4, 2002, Tr. at 150–54; Ex. D–19.) The parties reasonably increased the runoff rate to 12.5% in the April 20, 1998 Projections based upon reliable information available to them at the time. (*Id.*)

(d) The presumption of stable interest rates in the Projections was consistent with the interest rate environment in the four months prior to the Merger. (Greenspan, Feb. 4, 2002, Tr. at 151–52.) The drop in rates that occurred in June 1998 and thereafter was not something the parties could have predicted. (Greenspan, Feb. 4, 2002, Tr. at 172–73.)

(e) The parties to the Merger agreed to value the Portfolio at 1.5% (Rapp, April 12, 2001, Tr. at 175–76), and First Republic determined that a valuation using a multiplier of 1.5% was reasonable and consistent with the business environment and previous valuation report (Greenspan, Feb. 6, 2002, Tr. at 101–02; Ex. P–15, Attachment N, p. 2). Although Summit Bank used what might be viewed as a more conservative multiplier for lending purposes, it does not render the parties' agreement as to valuation unreasonable at the time the Projections were prepared.

(f) The Projections assumed the Debtor would have cash in the amount of $500,000 and, immediately after the Merger, the Debtor had cash in the amount of $611,000 (Ex. P–88). Even after payment of the Summit Bank origination fee of $70,000, the Debtor retained cash in the amount

of $541,000. Although the Debtor had to utilize the available cash shortly after the Merger to pay a Phoenix pre-Merger payroll and to bring Phoenix escrows into compliance with federal guidelines, the use of the cash does not make the Projections unreasonable at the time they were made.[37]

The LOI required that the Debtor have $500,000 available through a line of credit. (Ex. P–1, at 10). The Projections, however, did not show a need for drawing on the line of credit in the first year. Instead, the Projections show that "the $2 million dollars of cash flow is available, the debts are all paid, the principal is reduced, with the line of credit line item, but never drawing on that line of credit. In essence, if they had a half million dollar line of credit, that was an additional half million dollar insurance policy or backup to, again insure that they could pay their debts as they matured." (Greenspan, Feb. 6, 2002, Tr. at 141). The line of credit was not available until September 1998, at which time the Debtor drew down the line and held the funds as a "safety net." The unavailability of the line of credit until September 1998 is not a sufficient basis for finding the Projections to be unreasonable.

For the foregoing reasons, I disagree with the Debtor that post-Merger events proved the Projections to be unreasonable. To the contrary, the record here supports the reasonableness of the Projections.

The Defendants' expert, Greenspan, opined that the Projections were reasonable based upon his analysis of five "drivers" of the Debtor's business: (1) the volume of originations, (2) the expenses that

---

**37.** Other Parties to the Merger did not contemplate that the new entity would be responsible for paying these Phoenix obligations post-Merger. (Rapp, April 12, 2001, Tr. at 184–86.)

were being incurred in operating the business, (3) the revenue generated by the loan servicing portfolio, (4) the runoff of the portfolio, and (5) projecting the first year onto subsequent years.[38] (Greenspan, Feb. 6, 2002, Tr. at 126–27.) He determined that the parties' careful due diligence based on history and attention to detail that went into projecting figures for these five drivers resulted in a "very reasonable, thought-out business plan." (Greenspan, Feb. 6, 2002, Tr. at 127–39.) After reviewing the numerous drafts of Projections prepared by the parties, Greenspan remarked that the parties used "excruciating detail" which showed "they considered each of the aspects that was involved in this business from a cash basis, from a tax basis, from a principal payment basis, from a loan covenant basis, and how it would affect assets." (Greenspan, Feb. 6, 2002, Tr. at 115).

Despite the reasonableness of the Projections, the Debtor encountered serious financial difficulties after the Merger. (*See* Ex. P–44.) According to Greenspan, these difficulties occurred because: (I) shortly after the Merger, the Debtor deviated substantially from the business plan through expansion of the business that was not contemplated as part of the Projections process, and by not consolidating offices of the merged entities, as contemplated in the Projections, and (ii) unforeseeable economic events during the Debtor's first year of operations that impacted the economy, in general, and this Debtor, in particular. (Greenspan, Feb. 6, 2002, Tr. at 143–47.) First, the Debtor participated in two ventures post-Merger: an expansion which included setting-up and staffing an office in California to expand its government loan program (known as Government Direct), and the acquisition of a subprime loan broker known as Eagle Financial. (Greenspan, Feb. 6, 2002, Tr. at 144–48). Another significant deviation from the Projections was the failure to consolidate the Phoenix and Old Fidelity offices. (*Id.*) During the first eight months of the Debtor's operations (i.e., between May 1, 1998 and December 31, 1998), these deviations caused a $1,050,000 cash drain. (Greenspan, Feb. 6, 2002, Tr. at 163; Ex. P–117.) [39]

The Debtor argues that expansion of the business was contemplated to meet the increase in originations set forth in the Projections.[40] While the parties may have contemplated eventual expansion of the business, significant costs—such as expanding the government loan program in California—were not accounted for in the Projections. (Greenspan, Feb. 6, 2002, Tr. at 146–47). The ramifications of the expansions also impacted negatively on the Debtor on a number of levels. The government loan program, for example, not only caused the Debtor to expend cash for establishing the California offices, but the program also lost a substantial amount of

---

**38.** In evaluating the conflicting expert opinions on this topic, Greenspan's testimony and opinion are entitled to more weight. Among other reasons, Greenspan's qualifications show significantly more experience in the mortgage banking industry than Miller's. (Ex. D–81.)

**39.** Based upon his review of the Debtor's financial records, including the Statement of Operations for period ending December 31, 1998 (Ex. P–117), Greenspan attributed the cash outlays during the first eight months as follows: Government Direct—$570,000, Eagle Financial—$300,000, and non-consolidation of the offices—$180,000. (Greenspan, Feb. 6, 2002, Tr. at 152–163.) Miller offered no helpful testimony on these outlays.

**40.** The application to the Federal Reserve indicated that expansion into geographically diverse markets would not occur until the latter part of 1998 and continuing into 1999. (Ex. P–15.)

money during the first eight months and was very "capital intensive," because government loans require the loan originator to fund a larger portion of the escrows and deposits. (Greenspan, Feb. 4, 2002, Tr. at 177–78). Similarly, with respect to the purchase of Eagle Financial, after investing time, management resources, cash to buy it, and cash to fund the sub-prime loans, the sub-prime market collapsed after the Russian Bond crisis and flight to quality (which economic events are discussed in more detail *infra.*). (*Id.*, Tr. at 178–79.) Clearly, the unplanned expansions drained the Debtor's operations post-Merger.

Second, economic events in other parts of the world and the unexpected drop in mortgage interest rates, were unforeseeable factors that had a negative impact on the Debtor's operations post-Merger.[41] Prior to the Merger, in 1997, the Asian Crisis had devalued Old Fidelity's Portfolio, which resulted in a $650,000 decrease to the sale price for Old Fidelity.[42] (Greenspan, Feb. 4, 2002, Tr. at 112–13; Ex. P–47). In early 1998, however, interest rates stabilized. (Greenspan, Feb. 4, 2002, Tr. at 150–52; Ex. D–19 at 2.) Post-Merger, however, the mortgage rates began to drop again as the markets began to realize that the Asian Crisis was more wide-spread than originally thought. (Greenspan, Feb. 4, 2002, Tr. at 155–56.) Then, in the fall of 1998, Russia defaulted on its government bonds, an event known as the Russian Bond Crisis, that led to the collapse of the Long–Term Capital Market ("LTCM"). (*Id.*, Tr. at 156–57.) The Asian Crisis, Russian Bond Crisis, and LTCM failure created a "flight to quality," meaning that investors want to buy secure investments, which caused a huge demand for Treasury Bonds. (*Id.*, Tr. at 158.) This demand pushed mortgage interest rates substantially lower. (*Id.*) The impact on mortgage banking companies was an historic increase in originations, but mortgage servicing portfolios experienced faster run-off. (*Id.*, Tr. at 158–59). These economic forces had an even greater impact on the value of mortgage servicing portfolios. Due to the uncertainty of the credit markets and the flight to quality, the multiplier used to value a portfolio was lowered. (Greenspan, Feb. 4, 2002, Tr. at 159; Greenspan, Feb. 6, 2002, Tr. at 174–75.) Between November and December 1998, the value of the Debtor's assets dropped significantly as the Debtor wrote down the value of its Portfolio by decreasing the multiplier to 1.2. (Greenspan, Feb. 6, 2002, Tr. at 174, 179.) Although the physical assets of the Debtor remained the same, the write-down of Portfolio value in the amount of $1,405,000 took away half of the net worth of the company. (*Id.*, Tr. at 179–80.)

These economic events, which had a considerable negative impact on the Debtor post-Merger, were not predictable. (Greenspan, Feb. 4, 2002, Tr. at 173; *See also* Heise, June 6, 2001, Tr. at 161–62.) As a result, I cannot conclude, in hindsight, that the Projections were unreasonable or that the Debtor was left with an inadequate amount of assets to withstand such unforeseeable economic circum-

---

**41.** In discussing mortgage interest rates, Greenspan is talking predominantly about interest rates for 30–year fixed rate mortgages. (Greenspan, Feb. 4, 2002, Tr. at 90.)

**42.** In the summer of 1997, there was a crisis in the Thai banking industry that sent reverberations through the Thai economy and, in some ways, affected other Asian banking centers and investments (the "Asian Crisis"). (Greenspan, Feb. 4, 2002, Tr. at 91.) This caused a decrease in mortgage interest rates which, in turn, caused an increase in mortgage originations for mortgage banking companies. (*Id.*, Tr. at 94.)

stances. *See MFS/Sun Life Trust,* 910 F.Supp. at 944 ("While a company must be adequately capitalized, it does not need resources sufficient 'to withstand any and all setbacks.'")

■ In addition to reviewing the reasonableness of the Projections, courts evaluating the unreasonably small assets test under fraudulent transfer laws also compare the company to others in the industry. *Joy Recovery,* 286 B.R. at 76. In his report, Greenspan stated:

> [T]he mortgage banking industry differs from most other financial intermediaries and certainly has a different customary financial structure than a typical manufacturing concern. Successful mortgage banking companies operate in a highly leveraged environment utilizing warehouse lines to finance the origination and pooling of loans.

(Ex. D–81, at 17). Greenspan then compared New Fidelity's balance sheet against the industry average balance sheet (prepared using the Mortgage Banking Performance Report for 1998, published by the Mortgage Bankers Association of America) and determined that New Fidelity operated with ratios similar to industry benchmarks.[43] (*Id.*)

■ Finally, another factor to consider in an unreasonably small assets test is the length of time a company continued to operate and pay creditors after a disputed transfer. *Joy Recovery,* 286 B.R. at 76 ("[C]ourts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction.")[44] The Debtor filed its chapter 11 bankruptcy petition in this case on July 6, 1999—more than 14 months after the Merger. For the first eight months of operations (through December 1998), the Debtor had a positive cash balance at the end of each month.[45] (Greenspan, Feb. 6, 2002, Tr. at 166–67; Salmon, April 6, 2001, Tr. at 155–57; Ex. P–88). Greenspan performed a payables aging analysis of the Debtor's operations through the end of 1998 and determined that the Debtor was paying its bills currently throughout that period.[46] More-

---

**43.** This conclusion was contradicted by Miller, but his testimony was general and he did not provide any details of other information as to the basis for his comparison. (Miller, Dec. 10, 2001, Tr. at 153.)

**44.** The *Joy Recovery* Court cited to the following cases in support of this conclusion: *Moody,* 971 F.2d at 1074 (no unreasonably low capital where creditors paid for twelve months after transaction); *MFS/Sun Life Trust,* 910 F.Supp. at 944 (same where company was viable for eight months after LBO); *In re Ohio Corrugating Co.,* 91 B.R. 430, 440 (Bankr.N.D.Ohio 1988) (same creditors paid for ten months); *Managers Ass'n of Southern California v. Federal Co.,* 629 F.Supp. 175, 184 (C.D.Cal.1985)(twelve months); *cf. In re O'Day Corp.,* 126 B.R. 370, 407–08 (Bankr. D.Mass.1991)(trade creditors not being paid despite line of credit); *Vadnais,* 100 B.R. at 138 (trade creditors not being paid before and after LBO). *Joy Recovery,* 286 B.R. at 76.

**45.** After the Line of Credit was drawn in September 1998, the Debtor had in excess of $500,000 cash in its account at the end of each month. (Ex. P–88.)

**46.** Greenspan testified that some creditors (less than $80,000 worth) were being paid past a 60–day due date, but the range was between 40 and 80 days. (Greenspan, Feb. 6, 2002, Tr. at 167.) Greenspan further noted that $40,000 of the payables over 60 days included the payment due to seller's counsel, to which new management objected. (*Id.*) Other than ordinary trade disputes, there were no trade payables that were "chronic over 60 days" during the first eight months. (*Id.*) The payments that the Debtor failed to make post-Merger were payments of interest due on the Promissory Notes and payments due to the Phoenix shareholders, as part of the Merger, based upon their percentage of ownership in Phoenix. (Heise, June 25, 2001, Tr. at 68–69; *see also* Greenspan, Mar. 1, 2002, Tr. at 50–53 (conceding that payments

over, between May 1, 1998 and the date of the bankruptcy filing the Debtor made all interest payments due to Summit Bank (Salmon, April 6, 2001, Tr. at 157), including all interest payments due at the higher default rate of interest after Summit Bank sent the Debtor written notice of default in December 1998. (Salmon, April 6, 2001, Tr. at 193; Greenspan, Feb. 6, 2002, Tr. at 181.) The Debtor did not fail to make a payment to Summit Bank until December 31, 1998, when a principal payment was due.[47] (Salmon, April 6, 2001, Tr. at 194.)

The Debtor argues that its cash flow was tight immediately after the Merger. The Debtor noted that it had problems making payroll in May 1998—the first month after the Merger. (Salmon, April 6, 2001, Tr. at 153). However, the Debtor's Statement of Operations and Operating Cash Flow for the period May 1998 through August 1998 showed that the Debtor had positive net earnings before interest, taxes, depreciation and amortization ("EBITDA") of approximately $802,202. (P–18; Salmon, April 6, 2001, Tr. at 163.) Moreover, during this time, the Debtor expended substantial amounts of cash to fund its expansion.

In sum, the most convincing evidence presented in this case leads me to conclude that the Debtor was not left with unreasonably small assets after the Distribution. It was not reasonably foreseeable that the merger of Phoenix and Old Fidelity was doomed to fail; in fact, the carefully detailed Projections supported the parties' expectations that the synergies resulting from the Merger would take place. Despite cash flow issues, the Debtor was able to operate not just for eight months, but

also into 1999 while the Keystone Bank offer was being considered. The Debtor's post-Merger financial problems occurred primarily due to management decisions to deviate from the Projections, combined with detrimental economic conditions that were not predictable. The Debtor fails to meet its burden of proof under PUFTA § 5104(a)(2)(i).

(3) *Inability To Pay Debts Analysis.*

■ The final constructive fraud analysis under § 5104(a)(2) is whether the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value and intended to incur, or reasonably should have believed that it would, incur debts beyond the debtor's ability to pay as they became due. Here, the parties to the Merger clearly did not intend to create a new entity that was unable to pay its debts. The best evidence of the parties' belief that the Debtor would be able to pay its debts is found in the Projections, which I have already concluded are reasonable. Further, the conclusion that the Defendants did not intend to leave the Debtor unable to pay its debts is supported by the following: (I) rather than completely cashing out of Old Fidelity, the Defendants retained a 20% equity interest in the Debtor; and (ii) the Defendants agreed that a large portion of their payment was in the form of the Promissory Notes, subordinated to the Bank. (Greenspan, Feb. 6, 2002, Tr. at 95–97.) The Debtors have not proven constructive fraud under PUFTA § 5104(a)(2)(ii).

For all of the reasons set forth above, the relief requested in Counts I and IV of the Debtor's Complaint will be denied.

---

were not made to the Phoenix shareholders, but questioning whether they were due and payable at that time.))

47. There was a principal payment of $125,000 due on the Term Loan on December

31, 1998. (Ex. P–2, at 15.) The Debtor's unaudited balance sheets show that it held cash in the amount of $539,470 in December 1998. (Ex. P–88.)

## C. *Count II of the Debtor's Complaint: Liability for Breach of Fiduciary Duty.*

The Debtor also contends that the Defendants are liable under Pennsylvania Business Corporation Law for making the Distribution in violation of 15 Pa.C.S.A. §§ 1551(b) and 1553.[48] The Debtor argues that the Defendants breached their fiduciary duty to the corporation and failed to perform their duties in good faith as required by 15 Pa.C.S.A. § 1712.[49] My findings of fact and conclusions of law set forth in the discussion regarding fraudulent transfer law, *supra.*, demonstrate that the Distribution was not unlawful under § 1551. I have determined that, after the Distribution was made, the Debtor was not insolvent and was able to pay its debts as they became due in the ordinary course of business. Moreover, I have already concluded that the Projections were reasonable and, therefore, the Defendant's reliance upon them was in good faith.[50]

48. These sections provide, in pertinent part, as follows:

**§ 1551. Distributions to shareholders**

(a) **General rule:** Unless otherwise restricted in the bylaws, the board of directors may authorize and a business corporation may make distributions....

(b) **Limitation.** A distribution may not be made if, after giving effect thereto:

(1) the corporation would be unable to pay its debts as they become due in the usual course of its business; or

(2) the total assets of the corporation would be less than the sum of its total liabilities....

**§ 1553. Liability for unlawful dividends and other distributions**

(a) **Directors.** [A] director who votes for or assents to any dividend or other distribution contrary to the provisions of this subpart or contrary to any restrictions contained in the bylaws shall, if he has not complied with the standard provided in or pursuant to section 1712 (relating to standard of care and justifiable reliance), be liable to the corporation, jointly and severally with all other directors so voting or assenting, for the amount of the dividend that is paid or the value of the other distribution in excess of the amount of the dividend or other distribution that could have been made without violation of the provisions of this subpart or the restrictions in the bylaws.

49. **§ 1712. Standard of care and justifiable reliance**

(a) **Directors.** A director of a business corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director ... in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonably inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his duties, a director shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

(1) One of more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented.

(2) Counsel, public accountants or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person.

(3) A committee of the board upon which he does not serve, duly designated in accordance with law, as to matters within its designated authority, which committee the director reasonably believes to merit confidence.

50. The Debtor argues that the Defendants' reliance on the Projections, advice of counsel and information from other Parties to the Merger was not in good faith, because they (in particular, Steven Brand) had actual knowledge that made their reliance unreasonable. Section 1712(b) states: "A director shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause his reliance to be unwarranted." The Debtor claims the Brand's actual knowledge of the true rate of run-off for the Portfolio and the lower multiplier used by Summit Bank in determining

### D. *Count V of the Debtor's Complaint: Recharacterization or Equitable Subordination of the Promissory Notes.*

▮▮▮▮▮ The Debtor's complaint also contains a count for recharacterization or equitable subordination of the Defendants' claims arising from the Promissory Notes. The Third Circuit Court of Appeals recently considered this issue, writing that both recharacterization and equitable subordination are remedies that are "grounded in bankruptcy courts' equitable authority to ensure 'the substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'" *Cohen v. KB Mezzannie Fund II, L.P. (In re SubMicron Systems Corp.),* 432 F.3d 448, 454 (3d Cir.2006) *quoting Pepper v. Litton,* 308 U.S. 295, 305, 60 S.Ct. 238, 84 L.Ed. 281 (1939). The Court distinguished between the two remedies:

Equitable subordination is apt when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants.... In contrast, the focus of recharacterization inquiry is whether a debt actually exists, or, put another way, we ask what is the proper characterization in the first instance of an investment.

*SubMicron Systems,* 432 F.3d at 454. (citations omitted). The *SubMicron Systems* Court held that the issues of recharacterization and equitable subordination should be treated separately. *Id.* The Court further decided that, when both issues are raised, recharacterization should be considered first, because if a "particular advance is a capital contribution, .... then equitable subordination never comes into play." *SubMicron Systems,* 432 F.3d at 455 *quoting Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assocs., Ltd. P'ship),* 240 B.R. 124, 137 (Bankr.D.D.C.1999).

▮▮▮▮▮ There are a number of multi-factor tests that have been developed by courts considering recharacterization.[51] The Third Circuit, while recognizing the pertinence of the many-factored tests, de-

---

compliance with the loan covenants made any reliance on the Projections or other information "unwarranted." For the reasons discussed in relation to the fraudulent transfer claim, I have already decided that the Defendants' use of the run-off rate as set by the expert valuation and the higher multiplier in the Projections was reasonable. Even if Brand had such actual knowledge, I am not convinced that his reliance on other information available to him at the time was unreasonable. *See* the discussion at Section (B)(2), *supra.*

**51.** For example, in *Exide Technologies,* I considered an eleven factor test in determining whether recharacterization was proper, including: (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of re-

payments; (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the creditor and the stockholder; (vii) the security, if any for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments. *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Technologies, Inc.),* 299 B.R. 732, 740 (Bkrtcy.D.Del.,2003) *citing In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 750–53 (6th Cir.2001) (adopting eleven-factor test set forth in *Roth Steel Tube Co. v. C.I.R.,* 800 F.2d 625, 630–32 (6th Cir.1986)). *See also Stinnett's Pontiac Serv., Inc. v. Comm'r,* 730 F.2d 634, 638 (11th Cir.1984) *citing Estate of Mixon v. United States,* 464 F.2d 394, 402 (5th Cir.1972)(setting forth a thirteen factor test).

termined that the factors devolved to an "overarching inquiry":

> [T]he characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.

*SubMicron Systems*, 432 F.3d at 456. The Debtor argues that the Promissory Notes were intended by the parties to serve as equity in New Fidelity. Testimony from Steven Brand and the Defendants' expert witness, Greenspan, corroborates the Debtor's point. (Brand, April 30, 2001, Tr. at 15) (When discussing that the Defendants received the Promissory Notes as part of the Merger, Brand adds "[T]he Phoenix shareholders needed to structure a tax free event, and Peat Marwick went through many gyrations and ended that we, the old shareholders, although we would have liked to have held a higher equity position in the company, were told that in order for the transaction to work, ... we were limited to holding 20 percent of the equity, and that in order to accomplish the transaction, we needed to take back subordinated notes in the same value that Phoenix was [putting] into the acquisition company."); and Greenspan, Feb. 8, 2002, Tr. at 53 (When discussing the Projections, Greenspan states the Projections list the sub-debt [i.e., the Promissory Notes] each year, showing that "the sub-debt is never intended to be repaid back to the selling shareholders, that they were going to leave that equity or risk in the company.")

As stated by Greenspan, the Projections show that the parties do not provide for payment of any principal indebtedness under the Promissory Notes through the first five years of operations. (*See also* Ex. D–6, at 2.) Although the structure of the Merger referred to the amount due to the Defendants as "indebtedness" evidenced by Promissory Notes, the parties' plans and the economic realities of New Fidelity treated this amount as equity. I conclude that the parties intended the Promissory Notes to be an equity investment in New Fidelity. Since recharacterization of the Promissory Notes is proper, it is not necessary to address the claim for equitable subordination. *SubMicron*, 432 F.3d at 455.

## SUMMARY

For the reasons set forth above, I conclude that neither the Distribution nor the Promissory Notes were fraudulent transfers under § 5104 or § 5015 of PUFTA, and that the Defendants did not breach their fiduciary duty under the Pennsylvania Business Corporation Law, 15 Pa. C.S.A. §§ 1551(b) and 1553. Further, I conclude that the Promissory Notes should be recharacterized as equity. Accordingly, judgment will be entered against the Plaintiff and in favor of the Defendants on Counts I, II and IV of the Complaint. Judgment will be entered in favor of the Plaintiff and against the Defendants on Count V of the Complaint.

An appropriate order will be entered.

## ORDER

**AND NOW**, this 14th day of April, 2006, upon consideration of the Motion to Reopen the Record (docket no. 194) and the responses thereto, after a hearing, and for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** and **DECREED** that the request to apply issue preclusion to this proceeding, as set forth

in the Motion to Reopen the Record, is hereby **DENIED**; and further,

upon consideration of the Complaint and Answer filed in this adversary proceeding, and after trial, and upon consideration of all post-trial submissions filed by the parties hereto, and for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** and **DECREED** that:

1. Judgment is entered **IN FAVOR** of the **DEFENDANTS** and **AGAINST** the **PLAINTIFF** on Count I (fraudulent transfer of the Distribution of $1,705,000), Count II (Breach of Fiduciary Duty) and Count IV (fraudulent transfer of the Promissory Notes) of the Complaint; and

2. Judgment is entered **IN FAVOR** of the **PLAINTIFF** and **AGAINST** the **DEFENDANTS** on Count V (recharacterization of the Promissory Notes) of the Complaint so that the Promissory Notes in the aggregate original principal amount of $1,200,000., which were given to the Defendants in connection with the Merger, shall be treated as equity, rather than as subordinated debt.